## AFFIDAVIT IN SUPPORT OF
## APPLICATION FOR SEARCH WARRANTS

I, Thomas Robertson, being duly sworn, depose and state as follows:

## I.      INTRODUCTION

1.       I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for warrants to search certain properties identified in this affidavit, hereinafter referred to collectively as **"THE SUBJECT PREMISES,"** as well as certain electronic devices, hereinafter referred to collectively as **"THE SUBJECT DEVICES." THE SUBJECT PREMISES** and **THE SUBJECT DEVICES** are more fully described in each respective Attachment A for the items described in each respective Attachment B.

2.       I am a co-case agent for the investigation of Hector Aaron HERNANDEZ-Marentes, a.k.a. "Dickies," a.k.a. "Churrumino," and others associated with HERNANDEZ-Marentes and his Albuquerque, New Mexico, area drug trafficking organization (the "HERNANDEZ-Marentes DTO").

3.       During the investigation of the HERNANDEZ-Marentes DTO, agents employed a number of investigative techniques, including confidential sources ("CSs"), undercover agents ("UCs"), physical surveillance, cooperating defendant statements, traffic stops, and the court authorized interception of wire and electronic communications ("Title III Interceptions"). Those investigative efforts revealed the HERNANDEZ-Marentes DTO to be a multi-kilogram poly-drug trafficking organization whose day-to-day activities are currently run by HERNANDEZ-Marentes, and have been for several years.

4.       This investigation identified several members and affiliates of the HERNANDEZ-Marentes DTO, including HERNANDEZ-Marentes, Cristhian IBARRA-Quintero, Jose Mario

1

CORIA-Coria, Rene GONZALEZ-Bustillos and others known and unknown (the "SUBJECTS").

5.     Through this investigation, I learned that HERNANDEZ-Marentes maintains a residence at 3418 Crest Avenue SE #8, Albuquerque, New Mexico 87106 ("**HERNANDEZ-Marentes Residence**"), where agents believe he stores drugs, drug trafficking proceeds, and evidence of drug trafficking on behalf of the HERNANDEZ-Marentes DTO.

6.     I also learned that Cristhian IBARRA-Quintero, a.k.a. "Chino," maintains a residence at 2524 First Street NW, Albuquerque, New Mexico 87102 ("**IBARRA-Quintero Residence**" or "stash house"), where agents believe he stores drugs, drug trafficking proceeds, and evidence of drug trafficking on behalf of the HERNANDEZ-Marentes DTO.

7.     I also learned that Jose Mario CORIA-Coria, a.k.a. "Tali," a.k.a. "Taliban," maintains a residence at 2405 Alpine Road SW, Albuquerque, New Mexico 87105 ("**CORIA-Coria Residence 1**") where agents believe that he stores drugs, drug trafficking proceeds, and evidence of drug trafficking on behalf of the HERNANDEZ-Marentes DTO.  I also learned that CORIA-Coria maintains another residence at 2441 Tapia Boulevard SW, Albuquerque, New Mexico 87105 ("**CORIA-Coria Residence 2**"), where agents believe he stores drugs, drug trafficking proceeds, and evidence of drug trafficking on behalf of the HERNANDEZ-Marentes DTO. Similarly, agents have learned that CORIA-Coria maintains a third residence at 1924 Citation Street, Albuquerque, New Mexico 87105 ("**CORIA-Coria Residence 3**"), where agents believe he stores drugs, drug trafficking proceeds, and evidence of drug trafficking on behalf of the HERNANDEZ-Marentes DTO.

8.     I also learned that Rene GONZALEZ-Bustillos, a.k.a. "Guachochi" is employed

2

at and claims to own "AUDIO GUACHOCHI" (**GONZALEZ-Bustillo Work)** where agents

believe he stores drugs, records, documents, and other evidence of the money laundering

activities undertaken by HERNANDEZ-Marentes DTO.

9.      This affidavit is intended to show only that there is sufficient probable cause for

the requested warrants and does not set forth all of my knowledge about this matter.

## II.     THE SUBJECT PREMISES

| **A. HERNANDEZ-Marentes Residence**<br>3418 Crest Avenue SE #8<br>Albuquerque, New Mexico 87106 | **B. IBARRA-Quintero Residence**<br>2524 ~~2425~~ First Street NW<br>Albuquerque, New Mexico 87102 |
|---|---|
| **C. CORIA-Coria Residence 1**<br>2405 Alpine Road SW<br>Albuquerque, New Mexico 87105 | **D. CORIA-Coria Residence 2**<br>2441 Tapia Boulevard SW<br>Albuquerque, New Mexico 87105 |
| **E. CORIA-Coria Residence 3**<br>1924 Citation Street<br>Albuquerque, New Mexico 87105 | **F. GONZALEZ-Bustillo Work**<br>2528 Coors Boulevard SW<br>Albuquerque, New Mexico 87121 |

## III.    THE SUBJECT DEVICES

| **HERNANDEZ-Marentes PHONE 1**<br>Assigned call number (317) 496-6799,<br>IMSI number: 310260349740405 | **IBARRA-Quintero PHONE 1**<br>Assigned call number (303) 257-0130,<br>IMSI number: 310120163533035 |
|---|---|
| **CORIA-Coria PHONE 1**<br>Assigned call number (505) 288-4743,<br>IMEI number: 990008874394948 | **CORIA-Coria PHONE 2**      *TR*<br>Assigned call number (505) 361-8309,<br>IMSI number: 310260355256888 |
| **GONZALEZ-Bustillos PHONE 1**<br>Assigned call number (505) 238-4174,<br>IMSI number: 310120078993791 | All other electronic devices that are located at<br>the Subject Premises or in the Subject Vehicles. |

## IV.    THE SUBJECT VEHICLES

| **HERNANDEZ-Marentes TRUCK**<br>A 2007 GMC PICK-UP, BEARING NEW<br>MEXICO LICENSE PLATE AKNA74, and<br>VIN 3GTEC13C17G506662 | **IBARRA-Quintero CAR**<br>A 2016 NISSAN SENTRA, BEARING NEW<br>MEXICO LICENSE PLATE 300TTY |
|---|---|

3

## V.     AGENT BACKGROUND AND EXPERIENCE

10.     I am a Special Agent with the United States Drug Enforcement Administration ("DEA"), and have been since July 2018. As such, I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and I am empowered by law to conduct investigations and to make arrests for criminal offenses, to include those enumerated in 18 U.S.C. § 2516. Prior to my work as a special agent for the DEA, I was a police officer for the Chicago Police Department, and had been since February of 2013.

11.     I graduated from the DEA Training Academy in Quantico, Virginia. While at the DEA Training Academy I became familiar with how controlled substances are consumed, manufactured, packaged, marketed, and distributed. I received training on surveillance and counter-surveillance operations, undercover operations, confidential source operations, criminal law, and investigations involving federal electronic surveillance statutes, to include Title III wiretaps, drug identification, search warrant executions, and vehicle stops.  As a result, I am familiar with matters including, but not limited to, the means and methods used by persons and drug trafficking organizations to purchase, transport, store, and distribute illegal drugs and to hide profits generated from those transactions.

12.     My experience as a Special Agent includes, but is not limited to, conducting surveillance, interviewing witnesses, writing affidavits for and executing search and seizure warrants, debriefing defendants and confidential sources and working with undercover agents and informants.  I have received training and have experience in the investigation of violations of the federal drug and money laundering laws, including the offenses listed below.  As a result, I am familiar with matters including, but not limited to, the means and methods used by drug

4

traffickers and drug trafficking organizations to purchase, transport, store, and distribute illegal drugs and to hide profits generated from those transactions. I also have experience in analyzing and interpreting drug codes and cryptic dialogues used by drug traffickers. I have spoken to other law enforcement officers with similar experience.

## VI.    KNOWLEDGE OF DRUG TRAFFICKING

13.    Based upon my training and experience, and on my consultation with other law enforcement officers experienced in investigations regarding conspiracy to manufacture, distribute and possess with intent to distribute controlled substances, I have learned the following:

a.    Individuals involved in illegal trafficking of controlled substances often conceal evidence of their drug trafficking in their residences and businesses, or the residences and businesses of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports and outbuildings, and storage sheds. They also conceal evidence in vehicles, including vehicles outside of their residences, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at these residences or businesses. Evidence also may be found in other areas to which a drug dealer has ready access, such as rented storage areas and safety deposit boxes, or buried underground on their property. This evidence, which is discussed in detail in the following paragraphs, includes paraphernalia for weighing, packaging and distributing drugs, other contraband, records, documents, and evidence of drug transactions, proceeds from drug sales, and valuables obtained from proceeds. All such records as described in the paragraphs below can also be produced and/or stored on computers and other computer-related digital media such as a

5

computer hard drive, external hard drives, thumb drives, secure digital cards and other types of flash memory cards, compact disks and floppy disks, personal digital assistants (PDAs), BlackBerry devices, digital cameras and cellular telephones.

        b.        Individuals involved in illegal drug trafficking of controlled substances often keep quantities of controlled substances on their person, in their residences, garages, outbuildings, storage areas, carports, and yards, in their businesses, in the residences of friends or relatives, in their vehicles, in off-site storage facilities, and in other areas to which they have ready access.

        c.        Individuals involved in drug dealing commonly use certain paraphernalia to package and prepare controlled substances for distribution. The paraphernalia commonly includes packaging materials (such as plastic baggies, wrapping paper, cellophane, condoms, and film canisters) and scales to weigh controlled substances. Drug dealers commonly store these items on their person, in their residences, in their businesses, in the residences of friends or relatives, in their vehicles, and in other areas to which they have ready access.

        d.        Drug dealers often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators. These records may be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay/owe sheets, IOUs, miscellaneous notes, money orders, customer lists and telephone address books. These records can reflect names, addresses and/or telephone numbers

of associates and co-conspirators, the sale and purchase of controlled substances including precursors, customer lists and amounts of money owed to the trafficker by customers and by the trafficker to his/her suppliers. This type of documentation can be stored on digital media and evidence of these transactions is often contained within cellular phones.

       e.      Drug dealers often travel domestically and internationally to facilitate their trafficking. Evidence of foreign and domestic travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, hotel and gas receipts, and passports and visas and their contents. These items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of relatives and in cars. Many of these items are accessible via the internet and can be downloaded and saved on the computer or other media such as cellular phones.

       f.      Drug traffickers often use storage facilities for drugs and other items related to trafficking that are at a location away from their residences and businesses. These off-site storage facilities are often commercial storage lockers and rooms. These locations are often used to store or hide drugs, contraband, money and other valuables. Drug traffickers often keep documents and other items tending to show the existence of other stored drugs, contraband, money and other valuables in areas such as storage facilities. Those documents and other items include rental agreements, receipts, keys, notes and maps specifically concerning off-site storage rooms, lockers, and safety deposit boxes. This evidence may be found on their person or in their businesses, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives and cars. This type of documentation can be stored on digital media as small as a flash memory card, and may be concealed anywhere such media can be hidden.

7

g.      Other evidence of transportation, ordering, possession and sale of drugs can include the following: telephone bills to show numbers called by the drug dealers (and hence potential associates), overnight mail receipts, bank statements, deposit and withdrawal slips, savings books, investment statements, loan statements, other financial institution statements, and federal and state tax returns. The above items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars.  This type of documentation can be stored on digital media as small as a flash memory card, and may be concealed anywhere such media can be hidden.

h.      Documents showing who owns, occupies or controls the location being searched also show who is responsible for the items found on the premises, including contraband and other evidence seized. Documents and items showing the identity of the persons owning, residing in or controlling the area being searched commonly include utility and telephone bills, canceled envelopes and correspondence, outgoing answering machine messages, tax returns, keys, deeds, rental paperwork, and mortgage receipts. These documents may also be produced on computers, downloaded from online accounts or scanned into digital format and stored on computers and related digital media.

i.      Drug dealers usually sell their product for cash. Because large quantities of drugs can sell for thousands of dollars even at the wholesale level, dealers typically may have thousands of dollars in cash on hand both as proceeds of sales and to purchase their own supplies. In addition, drug dealers often have other assets generated by their drug business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles and

other valuables.

        j.      Individuals involved in drug dealing often try to legitimize these profits from the sale of drugs. To accomplish this goal, drug traffickers utilize foreign and/or domestic banking institutions and their attendant services, real estate and businesses, both real and fictitious. They also try to secrete, transfer and conceal the money by (a) placing assets in names other than their own to avoid detection while maintaining control, (b) laundering money through what appears to be a legitimate business or businesses, (c) hiding the money in their homes, safes and safety deposit boxes and/or (d) using the money to buy assets which are difficult to trace. This evidence is useful in a criminal prosecution, and it also is useful in identifying real and personal property that can be seized and forfeited by the government under existing laws. Documentation concerning this type of activity can be stored on digital media as small as a flash memory card, and may be concealed anywhere such media can be hidden.

        k.      Evidence of significant, unexplained income of drug dealers, or of the acquisition and concealment of money and assets of drug sales, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail. These records can be maintained on paper, but also can be maintained as electronic data on computers and other digital media. The above items are typically kept by drug

dealers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and cars.

l.      Drug dealers typically use cellular telephones and smart phones, standard telephones, pagers, two-way radio systems, fax machines, other communication systems, many of which can be accessed and controlled by computers or otherwise be communicated with by computers, counter-surveillance devices such as police radio scanners, and related devices in their drug trafficking activities. Drug dealers may also use smart phone communication applications such as WhatsApp, Snapchat, Facebook and others in order to facilitate their drug trafficking. These applications often store photos, messages, identifying information, and other evidence of drug trafficking activities on the smartphone itself. These physical devices are stored by drug dealers on their person or in their businesses, residences or cars, or the residences of friends or relatives.

m.     Information stored in electronic form on all of the above devices can provide evidence of drug trafficking and the identity of associates. For example, numbers stored in the telephones (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the drug dealer is calling, and thus the identity of potential associates. Pagers, cellular telephones and other communication devices can contain similar information.  Also, logs from fax machines can be evidence of messages sent and received, and the corresponding telephone numbers of possible associates and co-conspirators.

n.     Drug dealers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property and their drugs.  They usually maintain these

photographs and/or videos on their person or in their businesses, residences or cars, on computers, or in the residences of friends or relatives. Digital still and video cameras are becoming commonplace and may be used to record digital photographs or videos. Scanners may be utilized to convert older format photographs to digital format, and magnetic video can be transferred to digital format. All can be stored in computer hard drives and related digital media, as well as in cellular telephones.

o.     Drug dealers often maintain firearms and ammunition on their person or in their homes, businesses or cars to protect themselves, their drugs, and their drug profits. Like any firearm owner, they also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, firearms cleaning supplies, and instruction manuals and other documentation for firearms and ammunition.

p.     Drug dealers often conceal evidence of drug dealing in vehicles outside of their residences for ready access and to prevent detection and seizure by officers executing search warrants at their residences. This evidence, which is discussed in detail in the preceding paragraphs, includes controlled substances, indicia such as packing documents and electronic storage devices (and their contents,) evidence tending to show the distribution of drugs (such as IOUs, pay-owe sheets, ledgers, lists of names and numbers, telephone address books, et cetera), digital pagers (and their contents) cellular/mobile telephones (and their contents), and counter surveillance devices.

q.     These above described records, to include paper records scanned into digital format, also can exist in electronic form on the various media described in paragraph 3(d) above. Further, data that is processed by a computer may be written to the computer hard drive

or other storage media, such as a cellular phone, even if the user does not intentionally save the information. For example, a computer operating system may save temporary copies of files as backup copies or such files may remain on the hard drive or other media until overwritten by new data.

    r.  Electronic information can remain on computer storage media, such as hard drives, for an indefinite period of time.  I am aware that even when a computer user attempts to delete records from computer storage media, the records may still exist and be recovered through computer forensic techniques.

## VII. COMPUTER FORENSICS

   14.  Based on information provided to me by other DEA Special Agents and computer forensic specialists, I know that computer users sometimes encrypt files, and that such users may keep the encryption passwords or encryption keys separately written in their residences or in a separate computer file, which may be maintained on other portable media as described above.

   15.  Based upon my knowledge, training and experience, and consultation with other Special Agents and computer specialists, I know that in order to completely and accurately retrieve data maintained on computers and digital media by numerous software programs, to insure accuracy and completeness of such data, and to prevent the loss of the data from accidental or programmed destruction, it is often necessary that some of the computer equipment, peripherals, related instructions in the form of manuals and notes, as well as the software utilized to operate such a computer be seized and subsequently processed by a qualified computer specialist in a laboratory setting.  This is true because of the following:

    a.  Computer storage devices as described above can store the equivalent of

thousands of pages of information.  Additionally, a user may try to conceal criminal evidence by storing it in random order with deceptive file names.  This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of a crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on site.

    b.  Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data.

    c.  Data search protocols are scientific procedures designed to protect the integrity of the evidence and recover even "hidden," erased, compressed, password-protected or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (either from external sources or from a destructive code embedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

   16.  Because of the potential volume of the data at issue and the technical requirements set forth above, it is usually necessary for the above-referenced computer equipment, digital media and software and its related instructions to be seized and subsequently processed by qualified computer specialists in a laboratory setting.

   17.  Based upon my knowledge, training and experience and the experience of other law enforcement personnel, I know the searches and seizures of evidence from computers taken

from the subject premises commonly require agents to seize most or all electronic storage devices as well as the central processing units (CPUs). It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence listed above. In addition, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any application software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation.  Without these items, it may be difficult to recreate the computer environment in which the seized data was created.  This is important both for thorough analysis and for establishing the ultimate integrity of the seized data.

18.     Based upon my training and experience, as well as the training and experience of other law enforcement personnel and computer specialists, I believe that it is likely that contemporaneous analysis of hard drives, diskettes, CD-ROMS and other computer data storage media will be impractical and extremely time consuming. For that reason, it will be necessary to remove these items so as to facilitate an off-site analysis to locate evidence authorized to be seized by this search warrant. Thus, I request authorization to seize such items for off-site analysis to locate evidence authorized to be seized by the search warrant.

19.     Often, telephone answering machines are used to take messages. Computers may also be utilized as answering machines. Cellular telephones often store voice and text messages on the physical device which were sent or received through the cellular service and through smartphone communication applications. The incoming and outgoing messages can provide evidence of drug trafficking and the identity of associates while the outgoing messages can provide evidence of who controls the telephone line.

14

## VIII.   ELECTRONIC DEVICE FORENSICS

20.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

21.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how **THE SUBJECT DEVICES** were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on **THE SUBJECT DEVICES** because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.     Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.

15

Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

        e.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

      22.    *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of **THE SUBJECT DEVICES** seized pursuant to this warrant's authorization of the search of **THE SUBJECT PREMISES** consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

      23.    *Manner of execution.*  Because this warrant seeks only permission to examine **THE SUBJECT DEVICES** once they are already in law enforcement's possession, the *execution* of the search of the contents of **THE SUBJECT DEVICES** does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night specifically with regards to the contents of **THE SUBJECT DEVICES**.

## IX.    INVESTIGATIVE TOOLS

24.    During the course of this investigation, investigators employed a number of investigative techniques including confidential sources ("CSs"), undercover police officers ("UCs"), physical surveillance, cooperating defendant statements, trash pulls and the court authorized interception of wire and electronic communications ("Title III Interceptions").

### *Title III Interceptions*

25.    During the course of this investigation, agents developed probable cause to believe the HERNANDEZ-Marentes DTO used the following telephone numbers to facilitate drug trafficking:

| Identifier | Number | Subscriber | Address | User |
|---|---|---|---|---|
| HERNANDEZ-Marentes PHONE 1 | 317-496-6799 | Melissa CEDILLO | 3055 Coors Boulevard SW, Albuquerque, NM 87121 | HERNANDEZ-Marentes |
| HERNANDEZ-Marentes PHONE 2 | 505-347-4280 | Gerardo MARTINEZ | 3055 Coors Boulevard SW, Albuquerque, NM 87121 | HERNANDEZ-Marentes |
| IBARRA-Quintero PHONE 1 | 720-481-1243 | Cristian IBARRA | 4010 Central Avenue SW, Albuquerque, NM 87105 | IBARRA-Quintero |
| IBARRA-Quintero PHONE 2 | 303-257-0130 | Juan RIOS | 4010 Central Avenue SW, Albuquerque, NM 87105 | IBARRA-Quintero |
| IBARRA-Quintero PHONE 3 | 505-306-0955 | Juan RIOS | PO BOX 15955 Lenexa, KS 66285 | IBARRA-Quintero |
| CORIA-Coria PHONE 1 | 505-288-4743 | OAS Phone in a Box | 295 Parkshore Dr. Folsom, CA 95630 | CORIA-Coria |
| ~~CORIA-Coria PHONE 2~~ | ~~505-377-6014~~ | ~~Jose CARMONA~~ | ~~515 Rio Bravo Boulevard SW, Apt. 23, Albuquerque, NM 87105~~ | ~~CORIA-Coria~~ |
| CORIA-Coria PHONE 3 | 505-238-7815 | EZPAY | 3500 College BL, Leawood, KS 66211 | CORIA-Coria |

26.    The Honorable Senior United States District Judge Judith C. Herrera of the District of New Mexico authorized the interception of wire and electronic communications to and from HERNANDEZ-Marentes PHONE 1 pursuant to court order MR-19-773, dated July 9, 2019. During this period of interception, agents intercepted wire and electronic communications

17

on HERNANDEZ-Marentes PHONE 1.  This interception terminated on August 8, 2019.

27.     Judge Herrera also authorized the renewal of interception of wire and electronic communications to and from HERNANDEZ-Marentes PHONE 1 pursuant to court order 19-MR-773, dated August 29, 2019. The period of interception began on September 6, 2019, and is authorized to continue for 30 days. So far, agents have intercepted pertinent wire and electronic communications on HERNANDEZ-Marentes PHONE 1.

## X.     SUBJECTS

### A.     Hector Aaron HERNANDEZ-Marentes
(a.k.a., Dickies Nernandez"; "Dickies Hernandez"; "Dickies Churrumino")

| | |
|---|---|
| **Suspected Role:** | Leader of Albuquerque-based Meth DTO |
| **DOB:** | 09/21/1985 |
| **Current Address:** | 3418 Crest Avenue SE, Albuquerque, NM 87106 |
| **SSN:** | None, believed to be Mexican National |

**Criminal Conduct:**   HERNANDEZ-Marentes has connections to Juan RAMOS-Alonzo, a multi-kilogram distributor of methamphetamine from Albuquerque, NM to Des Moines, IA.  Based on a DEA Des Moines investigation, RAMOS-Alonzo was arrested in January 2018 and an extraction of his cellular phone revealed text message correspondence with HERNANDEZ-Marentes PHONE 1 listed as "Diki,", the known alias of HERNANDEZ-Marentes.  The text message correspondence dating back to February 2017, indicated HERNANDEZ-Marentes and RAMOS-Alonzo were coordinating a shipment of drugs at the direction of a male agents believe to be Jesus Armando MIXTEGA-Villegas.  MIXTEGA-Villegas was arrested in March 2019 by Albuquerque DEA and a cellular extraction of one of MIXTEGA-Villegas' phones revealed communication with HERNANDEZ-Marentes PHONE 1 dating back to June 2017.

On November 16, 2017, HERNANDEZ-Marentes was arrested by NMSP regarding the controlled delivery of approximately fourteen pounds of methamphetamine. HERNANDEZ-Marentes was the intended recipient of the methamphetamine.  Although HERNANDEZ-Marentes assumed possession of approximately two pounds of methamphetamine, the State of New Mexico declined to prosecute him.

Toll analysis from a July 16, 2018 UC purchase of approximately one pound of methamphetamine from Juan PAYAN-Gaytan indicated that HERNANDEZ-Marentes may have been the source of supply. Agents have conducted three successful UC purchases from HERNANDEZ-Marentes on January 10, 2019, February 7, 2019, and

18

May 23, 2019 for approximately three pounds of methamphetamine.

| CRIMINAL HISTORY OF HERNANDEZ-MARENTES | | | |
|---|---|---|---|
| Date | Case Number / Arresting Agency | Charges | Disposition |
| 11/16/2017 | 170012509 (NM State Police) | Trafficking Contr. Sub. (PWID) (Narcotic or Meth) (1st Offense) | Nolle Prosequi |

**B.**   **Rene GONZALEZ-Bustillos** (a.k.a., "Guachochi")
   **Suspected Role:**     Leader of Cocaine/Meth Distribution Organization
   **DOB:**            11/07/1985
   **Current Address:**   5525 Cleo Road SW, Albuquerque, NM 87121
   **SSN:**            None, believed to be Mexican National

**Criminal Conduct:**   Social media and CS reports indicate that GONZALEZ-Bustillos is the owner of AUDIO GUACHOCHI, an audio shop in Albuquerque, NM which agents suspect is being used by GONZALEZ-Bustillos to launder drug proceeds.  AUDIO GUACHOCHI is not a registered business entity and GONZALEZ-Bustillos has never had any reported wages in the state of New Mexico.  AUDIO GUACHOCHI is directly connected to the last two purchases of methamphetamine from HERNANDEZ-Marentes.

On February 7, 2019, HERNANDEZ-Marentes was the driver of a white mini-van used to facilitate the exchange of a pound of methamphetamine to UC-1.  The same vehicle was observed to travel to AUDIO GUACHOCHI following the termination of the UC buy/walk.  On May 23, 2019, HERNANDEZ-Marentes supplied UC-2 with a pound of methamphetamine.  The vehicle he used during the transaction travelled to AUDIO GUACHOCHI after the completion of the UC buy/walk.

GONZALEZ-Bustillos has been reported by CS-2 and CS-3 to traffic cocaine and methamphetamine.[1]  Since August 2016, CS-2 and CS-3 have indicated GONZALEZ-

---

[1] CS-2 has never been an active informant in this investigation.  CS-2's information was based on his/her own personal knowledge, observations, and conversations with members of associates of the HERNANDEZ-Marentes DTO.  CS-2 has no criminal history and was financially motivated to assist agents in prior DEA investigations. As CS-2 has never been an active informant during this investigation, CS-2 did not receive payment for information that has furthered this investigation.  In August 2016, CS-2 provided information to agents regarding a target of this investigation which agents independently corroborated through surveillance, public and law enforcement records research, and social media research.  Based on this, agents believe CS-2 has been a reliable and credible source. In addition, CS-2 was proved to be reliable and credible in other DEA investigations. Specifically, CS-2 has completed two controlled purchases

Bustillos is associated with three other Albuquerque based traffickers, one of whom GONZALEZ-Bustillos was believed to supply with drugs. CS-3 also indicated that GONZALEZ-Bustillos was known to traffic approximately eighty kilograms of cocaine a month. In October 2018, CS-3 informed agents that CS-3 had gone into AUDIO GUACHOCHI and observed a "kilo-sized" package containing a white, powder substance to be placed on counter. CS-3 was directed by agents in March 2019 to enter AUDIO GUACHOCHI and gather any relevant information on the business. CS-3 did not observe a credit card terminal at the business. CS-3 was able to speak with GONZALEZ-Bustillos who indicated he did not want to get involved in problems but offered to connect CS-3 to someone who could possibly supply CS-3 with drugs.

| CRIMINAL HISTORY OF GONZALEZ-Bustillos | | | |
|---|---|---|---|
| Date | Case Number & Arresting Agency | Charges | Disposition |
| 09/03/2007 | Albuquerque Police Department | Battery (Household Member) | Unknown |

---

of drugs at the behest of the DEA. One of the controlled purchases provided justification for a wire investigation. The wire investigation ultimately lead to criminal charges against three DEA targets. Case agents believe CS-2 has provided credible information based on independent corroboration of information provided regarding targets of this investigation and his/her assistance with a prior DEA investigation.

CS-3's information was based on his/her own personal knowledge, observations, and conversations with members of the HERNANDEZ-Marentes DTO. CS-3 has criminal history related to the distribution of methamphetamine in 2016. Due to his/her arrest, CS-3 has been cooperating with law enforcement in exchange for consideration regarding current charges he/she is facing. CS-3 has provided credible intelligence regarding members of the HERNANDEZ-Marentes DTO which agents have been able to independently corroborate through surveillance, public and law enforcement databases, social media research, phone toll analysis, and text messages. With regard to the current and previous investigations, CS-3 has introduced undercover agents to four targets and conducted numerous controlled purchases of drugs at the behest of the DEA. Those controlled purchases led to the arrest of one DEA target. CS-3 has also acted as a major source of information for several other Albuquerque, NM based traffickers. Case agents believed CS-3 has provided credible information and will continue to do so based on corroboration of nearly all of the information relayed to agents thus far and his/her prior assistance with other investigations.

C.    **Cristhian IBARRA-Quintero** (a.k.a., "Chino")
      **Suspected Role:**      Facilitator for HERNANDEZ DTO/ SOS
      **DOB:**      05/23/1983
      **Last Known Residence:**      2513 Mervosh Ave SW Albuquerque, NM 87105
      **SSN:**      None, believed to be Mexican National

**Criminal Conduct:**   A vehicle registered to IBARRA-Quintero was used to facilitate the transfer of approximately one pound of methamphetamine from HERNANDEZ-Marentes to UC-1 on February 7, 2019. UC-1 believed a male matching IBARRA-Quintero's New Mexico Driver's License description was a passenger in the vehicle seen on February 7, 2019. IBARRA-Quintero's vehicle was seen parked behind AUDIO GUACHOCHI on March 5, 2019. In May 2018, CS-4 provided information to agents regarding IBARRA-Quintero.[2] IBARRA-Quintero was believed by CS-4 to be in the process of receiving Oxycodone pills through the mail from an unidentified male source of supply in Mexico. CS-4 stated he/she was present when IBARRA-Quintero placed a call to the Mexican source of supply and was allowed to speak with the source of supply. CS-4 was informed by the source of supply that he would be sending pills to Albuquerque and if everything went well he would send more pills in addition to cocaine.

During the T-III intercepts of HERNANDEZ-Marentes Phone 1, IBARRA-Quintero has been shown to be a connection for sources of supply for HERNANDEZ-Marentes. The intercepts, surveillance, and records gathered, show that IBARRA-Quintero organizes the delivery of bulk drugs to Albuquerque, assists the distribution to HERNANDEZ-Marentes and others, and coordinates the payment of couriers and sources of supply. On July 10, 2019, for example, agents observed HERNANDEZ-Marentes and IBARRA-Quintero wiring money ($300) at an Albuquerque Walmart to a courier who received the funds at a Walmart in Arizona, as corroborated by Walmart records and T-III intercepts.

---

[2] CS-4 has never been an active informant in this investigation. CS-4's information was based on his/her own personal knowledge, observations, and conversations with members of the HERNANDEZ-Marentes DTO. CS-4 has a criminal history for drug trafficking. In 2007, CS-4 was arrested for the distribution of cocaine. Due to his/her arrest, CS-4 was initially cooperating with law enforcement for consideration regarding his/her charges. Once CS-4's charges were resolved, CS-4 began cooperating with law enforcement for financial gain. As CS-4 has never been an active informant during this investigation, CS-4 did not receive payment for information that has furthered this investigation. CS-4 has provided credible intelligence regarding members of the HERNANDEZ-Marentes DTO which agents have been able to independently corroborate through surveillance, public and law enforcement databases, and social media research. CS-4 has been of great assistance to this investigation and numerous other DEA cases since he/she was approved as a CS. CS-4's cooperation with the DEA has spanned over a decade. In that time, he/she has introduced several undercover agents, completed recorded phone calls with targets, and has provided a wealth of information regarding Albuquerque, NM based traffickers. Case agents believe CS-4 has provided credible information based on independent corroboration of the information relayed to agents during prior investigations.

| CRIMINAL HISTORY OF IBARRA-QUINTERO | | | |
|---|---|---|---|
| Date | Case Number & Arresting Agency | Charges | Disposition |
| 06/12/2017 | 176112843 (ICE) | Nonimmigrant Overstay | On Bond from ICE |

**D.**   **Jose CORIA-Coria** (a.k.a., "Taliban," "Tali")
       **Suspected Role:**     Heroin SOS and Drug Dealer for HERNANDEZ DTO
       **DOB:**               4/18/1980
       **Current Residence:** 2405 Alpine Road SW, Albuquerque, NM 87105
       **SSN:**              None, believed to be Mexican National

**Criminal Conduct:**   Jose CORIA-Coria was arrested by DEA Albuquerque on December 31, 2008 with seventeen ounces of heroin and possession of a firearm.  See below for more information regarding CORIA-Coria's criminal history.  CORIA-Coria's known alias at the time of his arrest was "El Taliban".  Since the inception of the T-III intercept over **HERNANDEZ-Marentes PHONE 1**, agents have intercepted numerous calls between HERNANDEZ-Marentes and a male HERNANDEZ-Marentes refers to as "Tali".  Agents believe "Tali" is in fact CORIA-Coria.  The majority of the intercepted calls between CORIA-Coria and HERNANDEZ-Marentes relate to the transfer of drugs and currency.  For example on July 24, 2019, BARRERA-Sotelo contacted HERNANDEZ-Marentes via HERNANDEZ-Marentes PHONE 1 to ask for "one", which agents have interpreted to mean a quantity of drugs.  HERNANDEZ-Marentes then contacted CORIA-Coria, an Albuquerque based trafficker of heroin, and informed CORIA-Coria that he would send BARRERA-Sotelo to CORIA-Coria's residence for the quantity of drugs requested by BARRERA-Sotelo.  HERNANDEZ-Marentes then called BARRERA-Sotelo back and provided directions to CORIA-Coria's known residence on Alpine Road SW.  On a separate occasion on July 26, 2019, BARRERA-Sotelo contacted HERNANDEZ-Marentes to get "one", which agents have interpreted as an amount drugs.  HERNANDEZ-Marentes then contacted CORIA-Coria to ask if HERNANDEZ-Marentes could send BARRERA-Sotelo to CORIA-Coria for the purchase of drugs.  CORIA-Coria agreed and informed HERNANDEZ-Marentes of his current location on Tapia.  HERNANDEZ-Marentes then contacted BARRERA-Sotelo and instructed BARRERA-Sotelo to travel to the area of Tapia and Blake.  Agents are aware from this investigation that HERNANDEZ-Marentes travelled to 2441 Tapia Boulevard SW on May 23, 2019 after transferring a pound of methamphetamine to an UC.  On August 3, 2019, HERNANDEZ-Marentes contacted CORIA-Coria via **HERNANDEZ-Marentes PHONE 1** to ask for assistance with paying a "driver".  Agents are aware from other intercepted calls on that date between HERNANDEZ-Marentes and IBARRA-Quintero that IBARRA-Quintero had received a shipment of "tools", which agents believe is a code word for drugs, and needed to pay the driver for the delivery.  CORIA-Coria agreed to help with the matter.  Agents performed surveillance on HERNANDEZ-Marentes on August 3, 2019 and observed his vehicle, a dark blue GMC, to travel to 2441 Tapia Boulevard SW and park in the driveway of the residence.  Agents also observed a Hispanic male speak outside of the front passenger area of the blue GMC engaging in conversation with the occupant of the blue GMC.  The surveillance was performed in conjunction with intercepted calls over **HERNANDEZ-**

Marentes **PHONE 1** in which CORIA-Coria detailed his location on Tapia to HERNANDEZ-Marentes.

| Criminal History of CORIA-Coria | | | |
|---|---|---|---|
| Date | Court & Case Number | Charges | Disposition |
| 12/31/2008 | U.S. District Court (New Mexico) | Conspiracy to Violate 21 U.S.C. 841(a)(1) & (b)(1)(B) | Guilty Plea 99 Months Prison |
| 10/28/2015 | Texas | Alien Inadmissibility | Subject Removed from the United States |

E.     **Rodolfo DIBENE-Saavedra**
       **Suspected Role:**     Possible Mexican SOS
       **DOB:**                05/03/1986
       **Current Residence:**  Mexico
       **SSN:**                None known

**Criminal Conduct:**   On July 20, 2019, agents intercepted a call via **HERNANDEZ-Marentes PHONE 1** in which IBARRA-Quintero informed HERNANDEZ-Marentes that he would be receiving a visit from a friend from Hermosillo, Mexico. Agents interpreted this call to refer to a shipment of drugs originating from a potential Mexican source of supply. On July 24, 2019, agents intercepted a call via **HERNANDEZ-Marentes PHONE 1** in which IBARRA-Quintero informed HERNANDEZ-Marentes that the "parts of the machine" had arrived. Agents believe IBARRA-Quintero was referring to a delivery of drugs from IBARRA-Quintero's Hermosillo, Mexico source of supply. On July 24, 2019, agents established surveillance outside of IBARRA-Quintero's residence. Agents observed a white Nissan Frontier bearing Mexican license plate VE06600 arrive at IBARRA-Quintero's residence and then depart shortly thereafter. Agents followed the vehicle and requested that the Albuquerque Police Department (APD) perform a traffic stop on the vehicle. Agents observed the vehicle to travel to the Coronado Mall located at 6600 Menaul Boulevard NE, Albuquerque, NM. APD then conducted a pedestrian encounter on the three individuals that were observed exiting the Nissan Frontier. The individuals were identified by APD as: IBARRA-Quintero, Domingo AGUILAR, and Rodolfo DIBENE-Saavedra. DIBENE-Saavedra had an I-94 A (Departure Record from the Department of Homeland Security) in his possession. It had an admittance date to the United States of July 21, 2019. Agents were later able to retrieve border crossing information for the Nissan Frontier which showed the vehicle had entered into the United States on July 21, 2019 from Nogales, Mexico. Nogales, Mexico is in close proximity to Hermosillo. In light of the intercepted communications between IBARRA-Quintero and HERNANDEZ-Marentes, agents believe DIBENE-Saavedra is a Mexican source of supply for illegal drugs to this DTO.

23

*Target Offenses*

28.     As a result of my personal participation in the investigation, statements made to me by other law enforcement personnel involved in the investigation, reviews of reports of other law enforcement personnel which I have read and deemed to be reliable, there is probable cause to believe that the SUBJECTS have committed, are committing, and will continue to commit offenses involving violations of *inter alia*:

      a.     21 U.S.C. § 841 - possession with intent to distribute and distribution of controlled substances, namely heroin and methamphetamine;

      b.     21 U.S.C. § 843(b) - use of a communications facility to further the commission of a felony controlled substance offense;

      c.     21 U.S.C. § 846 - conspiracy to possess with intent to distribute and to distribute controlled substances, namely heroin and methamphetamine;

      d.     21 U.S.C. § 856 - maintaining a place for manufacture, distribution, or use of controlled substances;

      e.     21 U.S.C. §§ 952 and 960 – importation of controlled substances; and

      f.     18 U.S.C. §§ 1956 and 1957 - laundering of monetary instruments.

### XI.    PROBABLE CAUSE

### A.  May 23, 2019 UC Purchase and Surveillance Indicating GONZALEZ-Bustillos Work Is Used to Traffic Illegal Drugs

29.     On May 23, 2019, agents of the Albuquerque District Office (ADO) conducted an undercover purchase of one pound of methamphetamine from HERNANDEZ-Marentes.  A New Mexico State Police (NMSP) Officer working in an undercover (UC) capacity contacted HERNANDEZ-Marentes via **HERNANDEZ-Marentes PHONE 1** and arranged to meet with HERNANDEZ-Marentes at the Walmart parking lot located at 3500 Coors Boulevard SW, Albuquerque, NM 87121 for the exchange of one pound of methamphetamine.

30.     Prior to the UC meeting, surveillance was established in the vicinity of the Walmart parking lot.  Agents then observed a gray Mitsubishi bearing New Mexico license plate PCD604 arrive and park inside the Walmart parking lot.  A subsequent check of the New Mexico Department of Motor Vehicle records of New Mexico license plate PCD604 revealed the license plate to be registered to Mario MENDOZA at 1907 Isleta Boulevard SW, Albuquerque, NM 87121.

31.     At approximately 1:47 pm, HERNANDEZ-Marentes contacted the UC via **HERNANDEZ-Marentes PHONE 1** to advise the UC that he was in the vicinity of the Walmart and that he wanted the UC to meet him at the Panda Express parking lot located at 3506 Coors Boulevard SW, Albuquerque, NM 87105, HERNADEZ-Marentes further related that he was in in a silver car.

32.     The UC arrived at the Panda Express parking lot and observed HERNANDEZ-Marentes exit a silver Mitsubishi, at which time HERNANDEZ-Marentes waived the UC over to his direction as he opened the rear door of the silver Mitsubishi where he removed an object

from the vehicle.  HERNANDEZ-Marentes entered the UC vehicle, speaking briefly with the UC.  HERNANDEZ-Marentes then removed a black plastic bag from underneath his shirt and placed it on the center console of the UC vehicle.

33.     The UC opened the black plastic bag and observed a transparent Ziploc like bag containing a crystalline substance.  The UC asked HERNANDEZ-Marentes if he had weighed it and it was all there.  HERNANDEZ-Marentes stated that he did not know, this was how it was given to him but he advised the UC to let him know if it wasn't good and he would talk to them. The UC then exchanged $2,600.00 with HERNANDEZ-Marentes for the package. HERNANDEZ-Marentes then exited the UC vehicle, entered the silver Mitsubishi and departed from the meet location.

34.     Agents maintained surveillance of the silver Mitsubishi sedan.  At approximately 2:01 pm, agents observed the silver Mitsubishi sedan arrive and park at "Audio Guachochi" located at **GONZALEZ-Bustillos Work**.[3]  The passenger side door opened but agents were unable to identify if anyone got out of the silver Mitsubishi sedan.  The silver Mitsubishi sedan

---

[3] I know that Rene GONZALEZ-Bustillos claims to be the owner and claims to work at **GONZALEZ-Bustillos Work**.  But an inquiry with Workforce Solutions revealed that GONZALEZ-Bustillos has never had any reported wages in the state of New Mexico.  Through collaboration with United States Marshals Service (USMS) Deputy Mitch Varley, agents have discovered that "Audio Guachochi" (**GONZALEZ-Bustillos Work**) is not a registered business entity.  In March 2019, agents obtained information from a CS that GONZALEZ-Bustillos has been known to sell cocaine in the Albuquerque area.  Agents directed a CS to **GONZALEZ-Bustillos Work** in attempt to purchase cocaine from GONZALEZ-Bustillos.  GONZALEZ-Bustillos stated that he could not, but he could put him in touch with someone who could. During the surveillance operation, the CS also observed that there was no credit card terminal present in **GONZALEZ-Bustillos Work**.  As the business is most likely cash based, agents believed **GONZALEZ-Bustillos Work** is being used as a front to conceal an illegal drug business.  Based on my experience and conversations with other agents, I understand that these actions are consistent with a person attempting to conceal financial transactions and launder proceeds of illegal narcotics trafficking.

then departed and proceeded southbound on Coors Boulevard SW.  At approximately 2:06 pm,

agents observed the silver Mitsubishi sedan park in the driveway of **CORIA-Coria Residence 2**.

35.     Following the meeting with HERNANDEZ-Marentes, the UC transported the

package provided by HERNANDEZ-Marentes to the ADO where the UC weighed the suspected

methamphetamine (approximately 460.0 grams) and field tested the contents in the presence of

SA Geronimo Abrahao.  The field test yielded a presumptive positive for methamphetamine.

### B.  *February 7, 2019 UC Purchase Indicating HERNANDEZ-Marentes Residence and Gonzalez-Bustillos Work Are Used to Traffic Illegal Drugs*

36.     On February 7, 2019, agents of the Albuquerque District Office (ADO) conducted

an undercover purchase of one pound of methamphetamine from HERNANDEZ-Marentes.  A

Special Agent (SA) working in an undercover (UC) capacity contacted HERNANDEZ-Marentes

via **HERNANDEZ-Marentes PHONE 2** and arranged to meet with HERNANDEZ-Marentes at

the Target store located at 6100 Paseo Del Norte NE, Albuquerque, NM 87113 for the exchange

of one pound of methamphetamine.

37.     Prior to the UC meeting, surveillance was established at **HERNANDEZ-Marentes Residence**.[4]  Agents then observed a white Toyota minivan arrive at and depart from

---

[4] Based on surveillance and intelligence obtained by agents, I believe that **HERNANDEZ-Marentes Residence** is HERNANDEZ-Marentes' primary residence. I believe HERNANDEZ-Marentes stores and will continue to store drugs, drug proceeds, and evidence of drug distribution at **HERNANDEZ-Marentes Residence**. Throughout this investigation, and as explained in more detail below, agents have observed members of the HERNANDEZ-Marentes DTO at **HERNANDEZ-Marentes Residence** on multiple occasions, sometimes before or directly following the believed distribution of controlled substances. Agents have observed vehicles used by the HERNANDEZ-Marentes DTO parked at **HERNANDEZ-Marentes Residence**. Agents have observed HERNANDEZ-Marentes depart **HERNANDEZ-Marentes Residence** and travel directly to another location where HERNANDEZ-Marentes conducted suspected drug transactions.  Further, based on numerous intercepted wire and electronic communications, I believe HERNANDEZ-Marentes to be involved in an ongoing drug

**HERNANDEZ-Marentes residence**. Agents were able to confirm that HERNANDEZ-Marentes was the driver of the white Toyota minivan and also observed that the vehicle was occupied by two other passengers.

38.     Agents observed the white Toyota minivan enter the predetermined meet location set by the UC at the Target parking lot located at 6100 Paseo Del Norte, Albuquerque, NM and proceed to park next to the UC vehicle. At this time, agents were able to confirm the white minivan to bear New Mexico license plate 938WJD. A subsequent check of the New Mexico Department of Motor Vehicle records of New Mexico license plate 938WJD revealed the license plate to be registered to Cristhian Ibarra-Quintero at 1630 Los Lentes NE, Los Lunas, NM 87032.

39.     HERNANDEZ-Marentes exited the white Toyota minivan and entered the UC vehicle, speaking briefly with the UC. HERNANDEZ-Marentes indicated that he had the methamphetamine inside the white Toyota minivan. HERNANDEZ-Marentes then briefly entered the white Toyota minivan and returned to the UC vehicle. During this period, the UC was able to observe the front passenger of the minivan to be a Hispanic male, 25-30 years of age. It should be noted that following the meeting with HERNANDEZ-Marentes, the UC viewed a New Mexico driver's license photograph of Cristhian IBARRA-Quintero and believed the front passenger of the white Toyota minivan resembled IBARRA-Quintero.

40.     HERNANDEZ-Marentes then returned to the UC vehicle and removed a package wrapped in grey duct tape from underneath his shirt. The UC exchanged $2,600 with

---

distribution conspiracy. Therefore, I believe that evidence of drug trafficking will be found in **HERNANDEZ-Marentes Residence**.

HERNANDEZ-Marentes for the package.  HERNANDEZ-Marentes then exited the UC vehicle, entered the white Toyota minivan and departed from the meet location.

41.      Agents maintained surveillance of the white Toyota minivan.  Agents observed the white Toyota minivan arrive at **HERNANDEZ-Marentes Residence**.  HERNANDEZ-Marentes exited the white Toyota minivan. The white Toyota minivan then departed and proceeded to a business, "Audio Guachochi," (**GONZALEZ-Bustillos Work**).  Agents observed the white Toyota minivan park to the rear of **GONZALEZ-Bustillos Work** and both occupants entered the business.

42.      Following the meeting with HERNANDEZ-Marentes, the UC transported the package provided by HERNANDEZ-Marentes to the ADO where the UC weighed the suspected methamphetamine (approximately 557.8 grams) and field tested the contents in the presence of SA Geronimo Abrahao.  The field test yielded a presumptive positive for methamphetamine.

### C.  *June 17, 2019 T-III Intercepts and Surveillance Confirming Gonzalez-Bustillos is a Drug Trafficker*

43.      At approximately 9:15 p.m., based on intercepted T-III call session 631, **HERNANDEZ-Marentes PHONE 1** received a telephone call from **IBARRA-Quintero PHONE 1**.  IBARRA-Quintero asked HERNANDEZ-Marentes what did "he" tell HERNANDEZ-Marentes, to which HERNANDEZ-Marentes replied that HERNANDEZ-Marentes is going to pick up there.  IBARRA-Quintero then asked HERNANDEZ-Marentes where he is at.  HERNANDEZ-Marentes told IBARRA-Quintero to go to Rene's house, HERNANDEZ-Marentes then told IBARRA-Quintero over there. (Agent's notes: "Rene" has been identified as Rene GONZALEZ-Bustillos).

44.      At approximately 9:29 p.m., based on intercepted T-III call session 632,

HERNANDEZ-Marentes placed a telephone call to **GONZALEZ-Bustillos PHONE 1**.
HERNANDEZ-Marentes asked where GONZALEZ-Bustillos is at, to which GONZALEZ-Bustillos stated that he is at the house.  HERNANDEZ-Marentes then asked if GONZALEZ-Bustillos is in the back.  GONZALEZ-Bustillos replied that he is not and informed HERNANDEZ-Marentes that he is eating.  HERNANDEZ-Marentes then advised GONZALEZ-Bustillos that he is outside.  GONZALEZ-Bustillos informed HERNANDEZ-Marentes that he will be right there.

45.      At approximately 9:48 p.m., surveillance was established in the vicinity of 5525 Cleo Road SW.  (Agent's notes: 5525 Cleo Road SW has been identified through this investigation as the residence of Rene GONZALEZ-Bustillos). GS Valdez conducted a drive-by surveillance of 5525 Cleo Road SW and observed a dark blue pick-up parked in front of the residence. Cellular location information for **HERNANDEZ-Marentes PHONE 1** confirmed that **HERNANDEZ-Marentes PHONE 1** was in the vicinity of 5525 Cleo Road SW.

46.      At approximately 10:01 p.m., based on intercepted T-III call session 638, **HERNANDEZ-Marentes PHONE 1** received a telephone call from Melissa CEDILLO (HERNANDEZ-Marentes' girlfriend).  CEDILLO asked HERNANDEZ-Marentes if he is drinking and who he is with.  HERNANDEZ-Marentes told CEDILLO that he is with Rene. Later, HERNANDEZ-Marentes told CEDILLO that he is going to buy "a toot." A toot was translated from "pesa." Through conversations with other agents and law enforcement officers that are fluent in Spanish, "pesa" is a commonly used slang term for cocaine.  CEDILLO asked why HERNANDEZ-Marentes needs "a toot," to which HERNANDEZ-Marentes replied that he wants to have a good time.  CEDILLO later informed HERNANDEZ-Marentes that she wants to

go to "Round." HERNANDEZ-Marentes told CEDILLO that he will go over there.

47.    At approximately 10:07 p.m., SA Robertson observed the dark pick-up depart from 5525 Cleo Road SW and proceed eastbound on Winchester Road SW.

48.    At approximately 10:17 p.m., based on intercepted T-III call session 641, HERNANDEZ-Marentes received a telephone call from IBARRA-Quintero.  IBARRA-Quintero told HERNANDEZ-Marentes that he is outside.  HERNANDEZ-Marentes informed IBARRA-Quintero that he just left from there and instructs IBARRA-Quintero to come to Round 1 at the Coronado Mall.  IBARRA-Quintero asked HERNANDEZ-Marentes if he obtained a "hit". Through conversations with other agents and law enforcement officers, along with my training and experience, I believe IBARRA-Quintero is referring to a user amount of cocaine.

49.    9. At approximately 10:20 pm, based on intercepted T-III call session 648, HERNANDEZ-Marentes received a telephone call from IBARRA-Quintero.  HERNANDEZ-Marentes told IBARRA-Quintero that he turned off the phone already.  HERNANDEZ-Marentes then instructed IBARRA-Quintero to head over to where he is and HERNANDEZ-Marentes will give IBARRA-Quintero some.  Through interpretations of previous intercepted calls, agents believe that HERNANDEZ-Marentes intended to provide cocaine to IBARRA-Quintero that he obtained from GONZALEZ-Bustillos.

50.    At approximately 10:51 p.m., GS Valdez observed the dark pick-up parked in the parking lot outside Round 1, located at 6600 Menaul Boulevard NE. Cellular location information of **HERNANDEZ-Marentes PHONE 1** confirmed **HERNANDEZ-Marentes PHONE 1** to be in the vicinity of 6600 Menaul Boulevard NE.

51.    At approximately 11:04 pm, SA Abrahao observed a gray Nissan sedan bearing

New Mexico license plate 300TTY park near the dark pick-up.  A male wearing a white shirt,

jeans exited and entered Round 1.  Cellular location information for **IBARRA-Quintero**

**PHONE 1** confirmed **IBARRA-Quintero PHONE 1** to be in the vicinity of 6600 Menaul

Boulevard NE.

### D. July 15, 2019 T-III Intercepts and Surveillance Indicating IBARRA-Quintero Residence Is Used to Traffic Illegal Drugs

52.     At approximately 4:08 a.m., agents intercepted electronic communication

between **HERNANDEZ-Marentes PHONE 1** and **IBARRA-Quintero PHONE 1**, session 276.

IBARRA-Quintero sent a SMS text message stating, "They're waiting here".  Agents believe

that IBARRA-Quintero was referring to the drugs that he had received from the Source of

Supply (SOS) at **IBARRA-Quintero Residence**.

53.     At approximately 5:03 a.m., agents intercepted electronic communication

between HERNANDEZ-Marentes and IBARRA-Quintero, in session 277.  IBARRA-Quintero

sent a SMS text message stating, "I'm Sending some more with my buddies, wait to see what

they tell me".  Agents believe IBARRA-Quintero was referencing the money owed by the

HERNANDEZ-Marentes DTO which was owed to the SOS for the delivery of drugs to

**IBARRA-Quintero Residence**.

54.     At approximately 10:35 a.m., agents intercepted electronic communications

between HERNANDEZ-Marentes and IBARRA-Quintero, in sessions 280 and 281.

HERNANDEZ-Marentes sent a SMS text message stating 'How much do you need".  At

approximately 10:43 am, IBARRA-Quintero responded via SMS text message "$".  Agents

believe this text message exchange between HERNANDEZ-Marentes and IBARRA-Quintero

shows that money was still needed for the drugs that had arrived earlier from the source of

supply.

55.     At approximately 9:42 a.m., based on T-III intercept call session 294, IBARRA-Quintero called HERNANDEZ-Marentes and told him to make "them" ready.  HERNANDEZ-Marentes informed IBARRA-Quintero that he was going to get ready and head over to IBARRA-Quintero.  At approximately 10:28 am, HERNANDEZ-Marentes placed a telephone call to IBARRA-Quintero in session 297.  HERNANDEZ-Marentes asked IBARRA-Quintero to open the gate, that he was at the side, and needed IBARRA-Quintero to open the gate.  Agents believe that HERNANDEZ-Marentes was outside **IBARRA-Quintero Residence**, as it has a large gate to the south of the residence which gives access to the rear of the property.

56.     At approximately 10:29 a.m., based on T-III intercept call session 299, HERNANDEZ-Marentes placed a telephone call to Jason BARBER.  HERNANDEZ-Marentes told BARBER that he wanted "Jay" to see something and asked if he could go by, to which BARBER affirmed.  Agents believe that HERNANDEZ-Marentes was planning to retrieve drugs from **IBARRA-Quintero Residence** and bring some to BARBER.

57.     At approximately 10:35 a.m., SA Casiano observed a dark blue pick-up which is utilized by HERNANDEZ-Marentes, parked inside the gated area of IBARRA-Quintero Residence.  At approximately 10:40 am, Agents observed the dark blue pick-up depart from **IBARRA-Quintero Residence**.  Agents maintained surveillance of the dark blue pick-up.

58.     At approximately 10:46 a.m., based on T-III intercept call session 301. HERNANDEZ-Marentes received a call from IBARRA-Quintero.  HERNANDEZ-Marentes informed IBARRA-Quintero that he (HERNANDEZ-Marentes) had left a bottle of water that IBARRA-Quintero had opened up, in the box and that IBARRA-Quintero should put the bottle

in the refrigerator.  Based on my training and experience, along with discussions with other law enforcement officers, "water bottle" is a commonly used term that drug traffickers use to describe methamphetamine which makes reference to methamphetamines clear like color.

59.     At approximately 10:57 a.m., SA Casiano observed the dark blue pick-up pull into the parking lot in the vicinity of 2331 2nd Street SW.  SA Abrahao then observed HERNANDEZ-Marentes shut the gate of the address.  Agents received cellular location information for **HERNANDEZ-Marentes PHONE 1** which confirmed **HERNANDEZ-Marentes PHONE 1** in the vicinity of 2331 2nd Street SW, Albuquerque, NM 87102.

60.     At approximately 11:04 a.m., based on T-III call session 303, HERNANDEZ-Marentes placed a telephone call to IBARRA-Quintero.  HERNANDEZ-Marentes told IBARRA-Quintero that he was here and that HERNANDEZ-Marentes was counting the "gasoline" to put it in the truck, but it ended up short a small quarter of gas.  HERNANDEZ-Marentes added that since it is about 4 gallons, it ends up being almost one short, so HERNANDEZ-Marentes will try to see what he can do but he just wanted to inform IBARRA-Quintero.  HERNANDEZ-Marentes then asked IBARRA-Quintero if he is understanding, to which IBARRA-Quintero acknowledged.  IBARRA-Quintero then asked HERNANDEZ-Marentes if he is already coming to IBARRA-Quintero's location.  HERNANDEZ-Marentes replied that he will go back in a little while and asked why, to which IBARRA-Quintero stated that when HERNANDEZ-Marentes gets back, they will talk.  Agents believe HERNANDEZ-Marentes to be talking about the weight of drugs which was being sold to BARBER.  HERNANDEZ-Marentes has used "gasoline" several times in intercepted communication to describe drugs.  Agents believe "gasoline" to be methamphetamine and gallons to be a reference

34

to grams of weight.

61.     At approximately 11:28 a.m., SA Casiano observed the dark blue pick-up traveling northbound on 2nd Street SW.  SA Robertson observed the dark blue pick-up to be driving in tandem with a blue sedan.

62.     At approximately 11:42 a.m., SA Abrahao observed the dark blue pick-up and blue sedan park at **IBARRA-Quintero Residence**.  SA Abrahao then observed a male with a white shirt and blue jeans speaking with the driver of the blue sedan outside of the vehicle. Cellular location information of **HERNANDEZ-Marentes PHONE 1** confirmed **HERNANDEZ-Marentes PHONE 1** to be in the vicinity of **IBARRA-Quintero Residence**.

63.     At approximately 12:00 p.m., based on T-III call session 312, HERNANDEZ-Marentes received a telephone call from Melissa CEDILLO, HERNANDEZ-Marentes girlfriend. CEDILLO asked HERNANDEZ-Marentes his whereabouts, to which HERNANDEZ-Marentes replied that he is going to deliver the money and added that he will also pick up "Chino" to go and get his at the same time, so HERNANDEZ-Marentes won't have to do anything else.  CEDILLO then asked HERNANDEZ-Marentes if he saw him already.  HERNANDEZ-Marentes replied that he still has to do some things and added that he saw him "to do that" and then something came up.  Later, CEDILLO asked where HERNANDEZ-Marentes will drop off the money, to which HERNANDEZ-Marentes replies that it is close by "Chino's."  HERNANDEZ-Marentes further related that "Chino" would go drop off the money, then HERNANDEZ-Marentes was going to bring "Chino" back to his house, then HERNANDEZ-Marentes could go back home.  (Agent's notes: a.k.a. CHINO is a nickname utilized by IBARRA-Quintero).  SA Abrahao observed the sedan depart from **IBARRA-**

35

**Quintero Residence.**

64.     At approximately 12:04 a.m., SA Abrahao observed the dark blue pick-up enter the parking lot of the Red Roof Inn located at 2015 Menaul Boulevard NE, Albuquerque, NM 871087.  SA Abrahao then confirmed the vehicle to be parked in the parking lot of the Red Roof Inn.  Cellular location information of **HERNANDEZ-Marentes PHONE 1** confirmed **HERNANDEZ-Marentes PHONE 1** to be in the vicinity of 2015 Menaul Boulevard NE.

65.     At approximately 12:06 p.m., based on T-III call session 314, **HERNANDEZ-Marentes PHONE 1** placed a telephone call to **IBARRA-Quintero PHONE 1**. HERNANDEZ-Marentes asked where IBARRA-Quintero was.  IBARRA-Quintero replied 338. HERNANDEZ-Marentes then informed IBARRA-Quintero that he is already here.  Agents believe that HERNANDEZ-Marentes was meeting IBARRA-Quintero to give him the money from BARBER form the meeting earlier in the morning where HERNANDEZ-Marentes sold BARBER methamphetamine to give to the SOS.

66.     At approximately 12:16 p.m., GS Valdez observed the dark pick-up depart from the Red Roof Inn parking lot and proceed to the Circle K gas station, located at 2001 Menaul Boulevard NE, Albuquerque, NM 87107, where it parked at the gas pumps.  The driver and passenger exited and entered the Circle K.  At approximately 12:23 pm, GS Valdez observed the dark blue pick-up depart the Circle K and proceed westbound on Menaul Boulevard NE.  At approximately 12:26 pm, GS Valdez observed the dark blue pick-up park at **IBARRA-Quintero Residence**.

### E. July 15, 2019 T-III Intercepts and Surveillance Indicating HERNANDEZ-Marentes Residence, CORIA-Coria Residence 3, and IBARRA-Quintero-Residence Are Used to Traffic Illegal Drugs

67.     On July 15, 2019, at approximately 9:07 a.m., based on T-III intercept call session 412, **HERNANDEZ-Marentes PHONE 1** placed a telephone call to **CORIA-Coria PHONE 1** and arranged for the delivery of illegal drugs. During the call,[5] CORIA-Coria asked HERNANDEZ-Marentes to have "that" ready for later (referring to more drugs). CORIA-Coria also told HERNANDEZ-Marentes that he was Santa Fe, and they could meet later. HERNANDEZ-Marentes asked CORIA-Coria if he wanted the same (referring to the same amount of drugs delivered the night before). CORIA-Coria affirmed.

68.     At approximately 9:09 a.m., based on T-III intercept call session 413, HERNANDEZ-Marentes called IBARRA-Quintero, and discussed CORIA-Coria's drug order. During the call, HERNANDEZ-Marentes told IBARRA-Quintero that CORIA-Coria asked for the same (referring to amount of product delivered the night before). The parties discussed some monetary issues. IBARRA-Quintero asked HERNANDEZ-Marentes if CORIA-Coria wanted him to go "over there" already (possibly referring to **IBARRA-Quintero Residence**).

69.     At approximately 10:34 a.m., based on T-III intercept call session 421, HERNANDEZ-Marentes called CORIA-Coria to further coordinate the delivery of illegal drugs. During the call, CORIA-Coria told HERNANDEZ-Marentes to have the product ready later, and that he (CORIA-Coria) would have papers ready for the other one (referring to a similar deal that occurred the day before).  I believe that CORIA-Coria was referring to money owed to

---

[5] The calls and texts are summarized in this affidavit for brevity and clarity. Many, but not all, of those calls and texts were communicated in the Spanish language and all have been translated and/or summarized by experts in Spanish-to-English translation.

HERNANDEZ-Marentes when he stated that the papers would be ready.

70.     At approximately 5:59 p.m., based on T-III intercept call session 472, HERNANDEZ-Marentes contacted Erick BARRERA to coordinate the delivery of drugs from HERNANDEZ-Marentes to BARRERA.  During the call, BARRERA asked HERNANDEZ-Marentes if it could be done later.  HERNANDEZ-Marentes asked him how many, to which BARRERA replies just one.  HERNANDEZ-Marentes later stated that he needed to go "over there" and get it.  HERNANDEZ-Marentes then told BARRERA that he would tell the guy to bring it to HERNANDEZ-Marentes.  Based on my training an experience, and the information derived during this particular case, I believe "one" to be a reference to a pound of methamphetamine, as it is common for drug traffickers in conversation to make reference to a specific drug known to be sold by an individual by a number.

71.     At approximately 6:55 p.m., ADO agents utilized cellular location information of **HERNANDEZ-Marentes PHONE 1** and **CORIA-Coria PHONE 1** to establish surveillance in the vicinity of **HERNANDEZ-Marentes Residence**, along with the area of Vito Romero Road SW and Isleta Boulevard SW, Albuquerque, NM.

72.     At approximately 7:00 p.m., agents observed a gray Acura TSX driving towards **HERNANDEZ-Marentes Residence**. At approximately 7:02 p.m. agents observed the gray Acura TSX driving away from **HERNANDEZ-Marentes Residence** (based on the surveillance and intercepted calls summarized herein, agents believe that HERNANDEZ-Marentes was picked up and was passenger at the gray Acura TSX).

73.     At approximately 7:03 p.m., based on T-III intercept call session 485, HERNANDEZ-Marentes called CORIA-Coria to coordinate the delivery of illegal drugs. During

38

the call, CORIA-Coria told HERNANDEZ-Marentes that he (CORIA-Coria) was at a residence

by Isleta Blvd. and Candilo Street. CORIA-Coria instructed HERNANDEZ-Marentes to turn

right on Isleta from Rio Bravo, and Candilo would be on the left side of the street once

HERNANDEZ-Marentes passed Vito Romero Rd.

74.     At approximately 7:17 p.m., Group Supervisor (GS) Gabriel Valdez observed the

gray Acura TSX arrive on the street in front of the residence located at 1924 Citation,[6]

Albuquerque, NM (**CORIA-Coria Residence 3**).  At approximately 7:25 p.m., SA Abrahao

observed an individual matching the description of HERNANDEZ-Marentes entering the gray

Acura TSX while still parked in front of the residence. The gray Acura TSX departed the area

shortly after.

75.     At approximately 7:31 p.m., GS Valdez observed the gray Acura TSX turn into

the driveway of **HERNANDEZ-Marentes Residence**, where agents believe HERNANDEZ-

Marentes was dropped off.  The gray Acura TSX departed **HERNANDEZ-Marentes**

**Residence**. At approximately 7:45 p.m., SA Thomas Robertson observed the gray Acura TSX

parked at **IBARRA-Quintero Residence**,[7] where other unidentified individuals were waiting in

---

[6] Although the street signs indicate the residence is located on Candilo St., the official street
address is "Citation St."

[7] **IBARRA-Quintero Residence** is IBARRA-Quintero's residence, agents also believe the
HERNANDEZ-Marentes DTO is utilizing **IBARRA-Quintero Residence** as a stash house.
Surveillance, along with cooperating defendant statements have corroborated this.  I believe
IBARRA-Quintero stored and will continue to store drugs, drug proceeds, and evidence of drug
distribution at **IBARRA-Quintero Residence**. Throughout this investigation, and as explained
in more detail below, agents are aware that members of the HERNANDEZ-Marentes DTO
visited **IBARRA-Quintero Residence** on multiple occasions to engage in what agents believe to
be illegal narcotics transactions. Agents have observed vehicles used by the HERNANDEZ-
Marentes DTO parked at **IBARRA-Quintero Residence**. Agents have intercepted phone and
wire communications indicating that IBARRA-Quintero stores drugs and evidence of drug
trafficking at **IBARRA-Quintero Residence**. Therefore, I believe that evidence of drug

several different vehicles parked in front of the residence.

> **F. July 15, 2019 T-III Intercepts Indicating HERNANDEZ-Marentes Residence is Used to Traffic Illegal Drugs**

76.     At approximately 8:26 p.m., agents intercepted wire communications between HERNANDEZ-Marentes and Erick BARRERA following the meeting at **CORIA-Coria Residence 3** and after HERNANDEZ-Marentes was dropped off at **HERNANDEZ-Marentes Residence**.  Based on T-III intercept call session 493, HERNANDEZ-Marentes asked BARRERA where he was at.  BARRERA informed HERNANDEZ-Marentes that he was leaving Santa Fe.  HERNANDEZ-Marentes instructed BARRERA to come to **HERNANDEZ-Marentes Residence**, and that he (HERNANDEZ-Marentes) was there. Agents believe HERNANDEZ-Marentes now had the pound of methamphetamine BARRERA ordered earlier and was waiting to distribute it to BARRERA at **HERNANDEZ-Marentes Residence**.

77.     At approximately 8:36 p.m., based on T-III intercept call session 494, HERNANDEZ-Marentes called **IBARRA-Quintero PHONE** 1 to complain that CORIA-Coria did not complete the "17" for HERNANDEZ-Marentes.  IBARRA-Quintero asked HERNANDEZ-Marentes what he meant.  HERNANDEZ-Marentes then informed IBARRA-Quintero that he would take a picture and video to show IBARRA-Quintero.  HERNANDEZ-Marentes then informed IBARRA-Quintero that it was 16, nearly 17.  IBARRA-Quintero told HERNANDEZ-Marentes that he will go over there shortly, he further instructed HERNANDEZ-Marentes to tell "Tali" (Tali is a known nickname commonly used by CORIA-Coria).  HERNANDEZ-Marentes informed IBARRA-Quintero that he would tell him (CORIA-Coria)

---

trafficking is present and will be found in **IBARRA-Quintero Residence**.

and then would send a message to IBARRA-Quintero.  Agents intercepted a picture of a

substance that appeared to be consistent with heroin on a scale to IBARRA-Quintero.  The

intercepted picture was consistent with that of nearly 17 grams of heroin.



G.  *July 24, 2019 Interdiction and Courier Information Indicating that CORIA-Coria*
    *Residence 3, IBARRA-Quintero Residence, and HERNANDEZ-Marentes Residence*
    *Are Used to Traffic Illegal Drugs*

78.      On July 24, 2019, ADO agents working interdiction at the Greyhound Bus

Station, located at 320 1ST Street SW, Albuquerque, New Mexico 87102 intercepted Jocelyn

Noel PEREZ.  PEREZ consented to a search of her luggage, in which agents recovered 5.5

Kilograms (kg) of a crystalline substance, a subsequent field test, tested positive for

methamphetamine.

79.     On July 25, 2019, SA Casiano and SA Abrahao conducted an interview of
PEREZ.  Based on information agents obtained through this investigation through several
investigative techniques, PEREZ corroborated that she is part of the HERNANDEZ-Marentes
DTO, and has been involved in trafficking heroin, methamphetamine, pills, and marijuana since
2014, from Arizona to several other States in the United States.

80.     PEREZ stated that a few days prior to getting arrested by DEA on July 24, 2019,
she had followed a white Cadillac sedan, driven by a male identified through this investigation as
Michael THOMPSON.  PEREZ stated that the vehicle was also occupied by an older female, she
only knows as "GIGI".  PEREZ also stated that she did know loaded with an unknown amount of
drugs from Phoenix, AZ to Albuquerque, NM on July 13, 2019.  PEREZ described the vehicle
she was in as a gray Acura with Oklahoma plates, and indicated the vehicle was driven by
VILLAREAL.  PEREZ stated that she and VILLAREAL followed a marron Nissan sedan that
transported the drugs.  PEREZ indicated that the drugs were delivered to "Chino" (Cristhian
IBARRA-Quintero).  PEREZ further stated that she met Chino through VILLAREAL and that
VILLAREAL's boyfriend, Juan RIOS "aka Keli", "Kelite", is the one in charge of the drug
distribution operation for the DTO, and that RIOS has direct ties to a Mexican Cartel. PEREZ
stated that after the load vehicle delivered the drugs, she and VILLAREAL stayed at the Red
Roof Inn in Albuquerque from July 13, 2019 until July 16, 2019.  GIGI and Thompson stayed at
the Days Inn from July 13, 2019 until July 15, 2019.   PEREZ stated that she and VILLEREAL
stayed in Albuquerque to wait for IBARRA-Quintero to gather money they could transport the
money back to Phoenix.  PEREZ, VILLARREAL, GIGI, and THOMPSON travelled
to Albuquerque to deliver methamphetamine to IBARRA-Quintero.

81.     Agents were able to obtain information from the Red Roof Inn located at 2015 Menaul Boulevard NE, Albuquerque, NM that showed a VILLARREAL had rented room 338 on July 13, 2019 and checked out on July 15, 2019.  VILLARREAL provided her address as 1511 E Cambridge Avenue, Phoenix, AZ 85006 and provided the make and license plate of her vehicle as an Acura bearing Oklahoma license plate JHB887.   Agents were also able to obtain information from the Days Inn located 2120 Menaul Boulevard NE, Albuquerque, NM that showed Joy HAYS had rented a room from July 13, 2019 to July 15, 2019 and provided the make of her vehicle as a Cadillac DTS with Arizona license plate CKL5185.  Arizona license plate CKLS5185 is registered to Michael THOMPSON.  HAYS also provided 20 W. University Dr., Mesa AZ 85201 in her registration information and telephone number (480) 936-0607.

82.     PEREZ stated that while she was in Albuquerque she was assigned by VILLAREAL to "babysit" IBARRA-Quintero because IBARRA-Quintero is not good with money.  PEREZ stated that while she was in Albuquerque, she participated in delivering drugs with IBARRA-Quintero.  PEREZ described an event on July 15, 2019, in which she went with IBARRA-Quintero to HERNANDEZ-Marentes Residence to pick up an individual, identified by PEREZ by a photograph as HERNANDEZ-Marentes.  PEREZ further indicated that after they picked up HENRNADEZ-Marentes they drove to **CORIA-Coria Residence 3**, at a dead-end street to deliver one pound of methamphetamine.

83.     PEREZ stated that she and IBARRA-Quintero returned to **IBARRA-Quintero Residence**, following the meeting at CORIA-Coria Residence 3 and dropping HERNANDEZ-Marentes at **HERNANDEZ-Marentes Residence**.

43

**H.  July 24, 2019 T-III Intercepts Indicating CORIA-Coria Residence 1 is Used to Traffic Illegal Drugs**

84.     On July 22, 2019, at approximately 8:30 p.m., agents intercepted wire communications between HERNANDEZ-Marentes and Erick BARRERA.  Based on T-III intercept call session 1074, BARRERA asked HERNANDEZ-Marentes if there is anything. HERNANDEZ-Marentes asked BARRERA if he wants HERNANDEZ-Marentes to tell the guy and see where the guy is at, to which BARRERA affirmed and informed HERNANDEZ-Marentes that he needs one.  HERNANDEZ-Marentes told BARRERA that he would call the guy and call BARRERA back.  Agents believe that BARRERA was requesting one pound of methamphetamine, as it is common for HERNANDEZ-Marentes to refer to a pound of methamphetamine as "one".  Immediately following the call between HERNANDEZ-Marentes and BARRERA, HERNANDEZ-Marentes sent a SMS text message and attempted, without success, to place a telephone call to **CORIA-Coria PHONE 1** in sessions 1075 and 1076.

85.     At approximately 8:32 p.m., agents intercepted wire communications between HERNANDEZ-Marentes and Erick BARRERA.  Based on T-III intercept call session 1077, HERNANDEZ-Marentes informed BARRERA that he sent a message and also called the guy but he did not answer.  HERNANDEZ-Marentes informed BARRERA that the guy always replies to HERNANDEZ-Marentes' messages.  BARRERA acknowledged and informed HERNANDEZ-Marentes that he has the money.  HERNANDEZ-Marentes told BARRERA that he will likely have to go to Coors and Gun Club.  HERNANDEZ-Marentes then informed BARRERA that he is calling right now.  **CORIA-Coria Residence 1** is in the area of Gun Club Road SW and Coors Boulevard SW, Albuquerque, NM.

86.     At approximately 8:33 p.m., based on T-III intercept call session 1080, CORIA-

44

Coria asked HERNANDEZ-Marentes what the guy needs. HERNANDEZ-Marentes told CORIA-Coria that the guy wanted him (CORIA-Coria) to buy him some twenty dollar Bimbo donuts. CORIA-Coria informed HERNANDEZ-Marentes that he will call him back. HERNANDEZ-Marentes reassured CORIA-Coria that BARRERA will take the money at once. CORIA-Coria then asked how much does the guy need. HERNANDEZ-Marentes told CORIA-Coria that he needs two hundred dollar and some twenty dollar donuts. Agents believe that HERNANDEZ-Marentes and CORIA-Coria were speaking of methamphetamine and heroin. CORIA-Coria then instructed HERNANDEZ-Marentes to tell the guy to come to **CORIA-Coria Residence 1**. HERNANDEZ-Marentes affirmed and assured CORIA-Coria that he would tell BARRERA to leave the money with CORIA-Coria.

87.     At approximately 8:35 p.m., based on T-III intercept call session 1084, HERNANDEZ-Marentes instructed BARRERA to go to Coors and Gun Club, once he is there HERNANDEZ-Marentes will then instruct BARRERA further on how to get to **CORIA-Coria Residence 1**. HERNANDEZ-Marentes then told BARRERA to go over fast because he is possibly fighting with his wife.

88.     At approximately 9:08 p.m., based on T-III intercept call session 1087, BARRERA informed HERNANDEZ-Marentes that he is at the traffic light on Gun Club. HERNANDEZ-Marentes instructed BARRERA to pass Valley Gardens Drive SW, he will then pass a ditch and the street is on the right hand side, Southfield Drive SW. HERNANDEZ-Marentes asked BARRERA where he is at, to which BARRERA responded that he is passing the ditch. HERNANDEZ-Marentes then told BARRERA to make a right immediately after the ditch. BARRERA told HERNANDEZ-Marentes that the street is Southfield. Later in the

conversation, HERNANDEZ-Marentes instructed BARRERA that he would call CORIA-Coria

but would call BARERRA back to get the name of the street that **CORIA-Coria Residence 1** is

on.  BARRERA informed HERNANDEZ-Marentes that he is on the first street, Alpine Road

SW.  HERNANDEZ-Marentes told BARRERA that he does not remember the street but he has

to all the way to the end of the street, the house is the last house.  Agents have done surveillance

of **CORIA-Coria Residence 1** and know that Alpine Road SW is a dead-end.  Similarly, agents

know **CORIA-Coria Residence 1** to be the last house on the north side of Alpine Road SW.

89.     At approximately 9:14 p.m., based on T-III intercept call session 1090,

HERNANDEZ-Marentes asked BARRERA if the guy is outside and informed BARRERA that

when he shows up, tell the guy "Churromino" sent him, and that he works with "Churromino".

BARRERA acknowledged.  Agents know "Churromino" is a nickname commonly used by

HERNANDEZ-Marentes.

### I.  *August 1, 2019 T-III Intercepts and Surveillance Indicating CORIA-Coria Residence 1 is Used to Traffic Illegal Drugs*

90.     On August 1, 2019, at approximately 6:50 p.m., based on T-III intercept call

session 2081, BARRERA asked HERNANDEZ-Marentes if he can do something for him but he

will not arrive until 10:00 p.m. HERNANDEZ-Marentes told BARRERA that he can lend

BARRERA "one".  BARRERA reassured HERNANDEZ-Marentes that he can fix it up for him

and that money is not an issue and reiterates that he only needs "one".  Agents believe that

HERNANDEZ-Marentes and BARRERA were referring to one pound of methamphetamine, as

it is common for HERNANDEZ-Marentes to refer to a pound of methamphetamine in this

manner.

91.     At approximately 9:07 p.m., agents intercepted electronic communication

46

between HERNANDEZ-Marentes and BARRERA, session 1086.   BARRERA sent a SMS text message stating, "Is it going to go down". At approximately 9:08 p.m., agents intercepted electronic communication between HERNANDEZ-Marentes and BARRERA, session 1087. HERNANDEZ-Marentes sent a SMS text message stating, "Let me call". Agents believe that this SMS text message exchange between HERNANDEZ-Marentes and BARRERA was related to session 2081 when BARRERA requested a pound of methamphetamine be fronted by HERNANDEZ-Marentes.

92.     At approximately 9:08 p.m., based on T-III intercept call session 2089, HERNANDEZ-Marentes asked if BARRERA can go by **CORIA-Coria Residence 1**. CORIA-Coria asked HERNANDEZ-Marentes what time BARRERA will arrive, to which HERNANDEZ-Marentes stated around 10:00 to 10:20 p.m.. HERNANDEZ-Marentes asked CORIA-Coria if that is too late, because BARRERA just got out of work. CORIA-Coria informed HERNANDEZ-Marentes to call him to let him know. HERNANDEZ-Marentes acknowledged and told CORIA-Coria that he will call to confirm the time.

93.     At approximately 9:10 p.m., based on T-III intercept call session 2091, HERNANDEZ-Marentes asked BARRERA what time he will arrive at **CORIA-Coria Residence 1**. BARRERA informed HERNANDEZ-Marentes that he will arrive around 10:00 pm. HERNANDEZ-Marentes asked if BARRERA is sure, at which time, BARRERA stated that it is better to say 10:30 pm because he is currently working on Interstate 25 and Paseo Del Norte and that he will be there in a while. HERNANDEZ-Marentes told BARRERA that it is better if he is on his way now. BARRERA agreed but told HERNANDEZ-Marentes that he is currently unloading lumber at the Home Depot/Lowes on Paseo Del Norte. HERNANDEZ-Marentes

47

acknowledged and asked BARRERA if he should tell CORIA-Coria 10:20 pm, to which BARRERA affirmed.

94.     At approximately 9:11 p.m., based on T-III intercept call session 2096, HERNANDEZ-Marentes informed CORIA-Coria that BARRERA will arrive at **CORIA-Coria Residence 1** around 10:20 pm.  CORIA-Coria acknowledged.

95.     At approximately 9:30 p.m., agents established surveillance in the vicinity of **CORIA-Coria Residence 1**. At approximately 10:00 p.m., I observed three vehicles turning West on Alpine Rd., from Gun Club Rd.  One vehicle was an unidentified pickup truck, one was an unidentified pickup truck towing a trailer, and one was a white Chevrolet Tahoe with large chrome wheels.  All three vehicles appeared to stop at **CORIA-Coria Residence 1**.

### J.  *August 3, 2019 T-III Intercepts and Surveillance Indicating CORIA-Coria Residence 2, HERNANDEZ-Marentes Residence, and IBARRA-Quintero Residence Are Used to Traffic Illegal Drugs*

96.     On August 3, 2019, at approximately 11:56 a.m., based on T-III intercept call session 2248, IBARRA-Quintero told HERNANDEZ-Marentes that the "tools" had arrived. HERNANDEZ-Marentes then informed IBARRA-Quintero that he would head over after taking a shower.  IBARRA-Quintero acknowledged then stated that he could leave over there, so the "trailers dad" could leave and head back.  HERNANDEZ-Marentes then asked IBARRA-Quintero why IBARRA-Quintero could not bring the "tools" to him, to which IBARRA-Quintero asked how many.  HERNANDEZ-Marentes requested that IBARRA-Quintero give him twenty and HERNANDEZ-Marentes would return IBARRA-Quintero's call.  Agents believe that "tools" refers to drugs and that "trailers" is making reference to the courier that brought the drugs to New Mexico.

97.     At approximately 11:58 a.m., based on T-III intercept call session 2251,

HERNANDEZ-Marentes asked CORIA-Coria if he would help.  CORIA-Coria asked what

HERNANDEZ-Marentes needed help with, to which HERNANDEZ-Marentes replied that he

needs help to go lay the cement.  CORIA-Coria asked HERNANDEZ-Marentes how much.

HERNANDEZ-Marentes replied for the same with the "bulging eye."  CORIA-Coria instructed

HERNANDEZ-Marentes to lend him one and then afterwards, CORIA-Coria would see how it

works and CORIA-Coria would let HERNANDEZ-Marentes know.  CORIA-Coria asked

HERNANDEZ-Marentes what he thought, to which HERNANDEZ-Marentes replied that he

needed to pay the driver of the tractor.  CORIA-Coria assured HERNANDEZ-Marentes that it

will only be for a short period and would turn it in for some things.  CORIA-Coria explained that

he has one parcel but he is going to turn it.  CORIA-Coria reminded HERNANDEZ-Marentes

that it would only be for a while.  HERNANDEZ-Marentes asked CORIA-Coria if it can wait, to

which CORIA-Coria explained that it is already here.  HERNANDEZ-Marentes asked CORIA-

Coria if it belongs to him.  CORIA-Coria replied that it does and that he is waiting for them to

call back. HERNANDEZ-Marentes then informed CORIA-Coria that the driver of the tractor is

waiting on HERNANDEZ-Marentes so that he can get going with the tractor.  HERNANDEZ-

Marentes further explained that he has them there.  CORIA-Coria told HERNANDEZ-Marentes

that they need a lot, CORIA-Coria then instructed HERNANDEZ-Marentes to ask the guy how

he wants the money.  HERNANDEZ-Marentes agreed and reminded CORIA-Coria that he

already knows when the tractor has to get going, and the guy does not want to wait with

everything else.  HERNANDEZ-Marentes then asked CORIA-Coria if a "long while" is three or

four hours, to which CORIA-Coria affirmed.  Agents believe that HERNANDEZ-Marentes was

49

soliciting help from CORIA-Coria to pay a courier for the drugs that have arrived.  CORIA-Coria needs time to get the money together for HERNANDEZ-Marentes to pay the courier.

98.     At approximately 12:01 p.m., based on intercepted call session 2253, HERNANDEZ-Marentes informed IBARRA-Quintero that "Tali" (CORIA-Coria) will also help out.  IBARRA-Quintero then said that HERNANDEZ-Marentes already knew who has them, the guy from the "parcela's."  IBARRA-Quintero then told HERNANDEZ-Marentes that he was more than welcome to get whichever one HERNANDEZ-Marentes needs. IBARRA-Quintero added that HERNANDEZ-Marentes already knew the situation over at IBARRA-Quintero's. IBARRA-Quintero further related that HERNANDEZ-Marentes could get whichever one, but that IBARRA-Quintero needs help with the ride ("four bucks").  HERNANDEZ-Marentes asked IBARRA-Quintero around what time because he would not be able to do anything until two to three hours.  IBARRA-Quintero acknowledges and reiterated that he only needs those four bucks.  HERNANDEZ-Marentes informed IBARRA-Quintero that he will help out but demands that the other guy help IBARRA-Quintero out too.  IBARRA-Quintero told HERNANDEZ-Marentes that he was making things more secure for HERNANDEZ-Marentes.  HERNANDEZ-Marentes explained that IBARRA-Quintero was going to want to make HERNANDEZ-Marentes reliable by putting more pressure on him to pay the tractor that was "organizing the dirty." HERNANDEZ-Marentes then complained that the other guys are not doing anything, HERNANDEZ-Marentes then reminded IBARRA-Quintero that he knows all too well what IBARRA-Quintero is all about. Agents believe that IBARRA-Quintero needed $4,000 dollars to pay the drug courier. Similarly, agents believe that IBARRA-Quintero wanted HERNANDEZ-Marentes to pay the courier so they could meet to build trust between the two for future

50

transactions.

99.     At approximately 1:14 p.m., based on intercepted T-III call session 2285, HERNANDEZ-Marentes asked AGUILAR where he wanted to go. AGUILAR replied that he was on I-25 and Gibson Boulevard SE.  HERNANDEZ-Marentes instructed AGUILAR to go to the Burger King where he would meet AGUILAR. (Agent's notes:  The Burger King referenced is located at 2501 Mulberry Street SE, Albuquerque, NM 87106.  This location is in close vicinity to I-25 and Gibson Boulevard SE).  AGUILAR then asked HERNANDEZ-Marentes how many, to which HERNANDEZ-Marentes replied two.  Agents believe that HERNANDEZ-Marentes was setting up a meeting with AGUILAR in an attempt to collect $2,000 dollars for drugs, and that it was to be paid at the time HERNANDEZ-Marentes provided the drugs to AGUILAR.

100.    At 1:21 p.m., based on intercepted T-III call session 2291, HERNANDEZ-Marentes told AGUILAR that he was right there at the "seventh band." AGUILAR informed HERNANDEZ-Marentes that he would be right there. HERNANDEZ-Marentes asked AGUILAR if he knew where the "seventh band" is located.  AGUILAR replied that he did not. HERNANDEZ-Marentes informed AGUILAR that the location is called seven. AGUILAR then told HERNANDEZ-Marentes that his was a new phone, and he should feel comfortable saying whatever he wanted.  HERNANDEZ-Marentes then told AGUILAR that he was at University and Gibson.

101.    At approximately 1:30 pm, SA Sneden observed HERNANDEZ-Marentes' dark blue GMC pick-up parked at a gas pump at the Alon gas station, located at 1517 Gibson Boulevard SE, Albuquerque, NM 87106.  Agents confirmed the dark blue GMC pick-up to be

HERNANDEZ-Marentes'.[8] (Agent's notes:  There is a 7-Eleven located inside the Alon Gas station).  Cellular location information of **HERNANDEZ-Marentes PHONE 1** confirmed **HERNANDEZ-Marentes PHONE 1** to be in the vicinity of 1517 Gibson Boulevard SE.

102.  At approximately 1:42 p.m., SA Robertson observed a gray sedan park at the gas pump just to the west of HERNANDEZ-Marentes' dark blue GMC pick-up.  SA Robertson observed a male who resembled AGUILAR approach the opened driver side door of HERNANDEZ-Marentes' vehicle.  The male engaged in a brief interaction with HERNANDEZ-Marentes while HERNANDEZ-Marentes remained inside. After the interaction, the male returned to the gray sedan and departed from the gas station.  SA Robertson obtained a partial plate for the gray sedan of AJBN.  (Agent's notes: A later check of conducted of law enforcement databases yielded a gray 2014 Chevrolet Spark bearing New Mexico license plate AJBN45 registered to Myra AGUILAR at 720 Terracotta Place SW, Albuquerque, NM 87121. It should be noted that this address at 720 Terracotta Place SW is associated with Domingo AGUILAR).

103.  At approximately 1:41 p.m., based on intercepted T-III call session 2297, HERNANDEZ-Marentes asked CORIA-Coria for his location.  CORIA-Coria informed HERNANDEZ-Marentes that he was headed to the horses.  CORIA-Coria commonly refers to **CORIA-Coria Residence 2**[9] as the "house with the horses".  HERNANDEZ-Marentes later told

---

[8] HERNANDEZ-Marentes' dark blue GMC pickup truck is a 2007 GMC Sierra 1500, bearing New Mexico license plate AKNA74, and VIN 3GTEC13C17G506662. Supported by this affidavit, and as described further in a respective Attachment A, agents are requesting permission to search the GMC pickup on the shared driveway of 3418 Crest Avenue SE, where **HERNANDEZ-Marentes Residence** is located.

[9] **CORIA-Coria Residence 2** is one of Jose Mario CORIA-Coria residences, where agents believe the HERNANDEZ-Marentes DTO is utilizing **CORIA-Coria Residence 2** as a stash

CORIA-Coria to wait for him at the horses.  HERNANDEZ-Marentes then complained and

demanded that CORIA-Coria and the other guys help HERNANDEZ-Marentes out with gas

because he is not making any money.  CORIA-Coria affirmed and told HERNANDEZ-Marentes

to bring some things there.  HERNANDEZ-Marentes then informed CORIA-Coria that he was

on his way. Agents believe that CORIA-Coria wanted HERNANDEZ-Marentes to bring drugs to

CORIA-Coria when he paid HERNANDEZ-Marentes.

104.    At approximately 1:46 p.m., SA Sneden observed HERNANDEZ-Marentes' dark

blue GMC pick-up exit the Alon gas station and proceed westbound on Gibson Boulevard SE.

105.    At approximately 1:55 p.m., based on intercepted T-III call session 2306,

HERNANDEZ-Marentes informed CORIA-Coria that he was outside.  HERNANDEZ-Marentes

then asked CORIA-Coria where he was at, to which CORIA-Coria replied that he was there and

was not heading HERNANDEZ-Marentes' way.

106.    At approximately 1:58 p.m., SA Piatt observed HERNANDEZ-Marentes arrive

and park in the driveway of **CORIA-Coria Residence 2**.  **HERNANDEZ-Marentes PHONE 1**

placed a telephone call to **IBARRA-Quintero PHONE 1**.  Based on intercepted T-III call

session 2308, HERNANDEZ-Marentes informed IBARRA-Quintero that he would have "that"

---

house.  Surveillance and wire intercepts have corroborated this.  I believe CORIA-Coria stored
and will continue to store drugs, drug proceeds, and evidence of drug distribution at **CORIA-
Coria Residence 2**. Throughout this investigation, and as explained in more detail below, agents
are aware of members of the HERNANDEZ-Marentes DTO visiting CORIA-Coria Residence 2
on multiple occasions and engaging in what agents believe to be illegal narcotics transactions.
Agents have observed vehicles used by the HERNANDEZ-Marentes DTO parked at **CORIA-
Coria Residence 2**. Agents have intercepted phone and wire communications indicating that
CORIA-Coria stores drugs and evidence of drug trafficking at **CORIA-Coria Residence 2**.
Therefore, I believe that evidence of drug trafficking is present and will be found in **CORIA-
Coria Residence 2**.

by 5:30 or 6:00.  IBARRA-Quintero informed HERNANDEZ-Marentes to put $200 aside for "Gabacho."  IBARRA-Quintero later informed HERNANDEZ-Marentes that there will not be anything left because someone needs one, another person needs three and a separate person needs two.  HERNANDEZ-Marentes asked IBARRA-Quintero how much he had left.  IBARRA-Quintero replied fifteen.  IBARRA-Quintero later told HERNANDEZ-Marentes to give him an opportunity since HERNANDEZ-Marentes was going to at least give IBARRA-Quintero the two thousand bucks right now.  HERNANDEZ-Marentes told IBARRA-Quintero that these guys are going to take everything and that he needs to demand things from these guys.  IBARRA-Quintero later reminded HERNANDEZ-Marentes that he needs to come up with what belongs to these guys so they can leave.  IBARRA-Quintero then stated that there is no problem with the rest.  HERNANDEZ-Marentes requested that IBARRA-Quintero give him until 5:30.

107.    At approximately 1:59 p.m., I observed an unidentified male wearing a red shirt and blue jeans outside the opened rear passenger door of HERNANDEZ-Marentes' dark blue GMC pick-up, which was still parked at **CORIA-Coria Residence 2**. Cellular location information of **CORIA-Coria PHONE 1** around that time confirmed **CORIA-Coria PHONE 1** to be in the vicinity of **CORIA-Coria Residence 2**.

108.    At approximately 2:00 pm, SA Sneden observed HERNANDEZ-Marentes' dark blue GMC pick-up exit **CORIA-Coria Residence 2** and proceed northbound on Tapia Boulevard.  A short time later, agents lost surveillance of HERNANDEZ-Marentes' dark blue GMC pick-up.

109.    At approximately 3:11 pm, based on intercepted call session 2319, CORIA-Coria asked HERNANDEZ-Marentes what happened to them, being only a little bit.  HERNANDEZ-

Marentes then asked CORIA-Coria if he wanted to exchange them.  HERNANDEZ-Marentes

inquired whether the first one is not as bad.  CORIA-Coria stated that both of them are the same

way, and he thinks HERNANDEZ-Marentes stepped on them too much.  HERNANDEZ-

Marentes instructed CORIA-Coria to go get one out from their guy, it should be semi-good.

CORIA-Coria told HERNANDEZ-Marentes that he was under the assumption that they were

like the other ones, CORIA-Coria further added that the other ones were bad ass. CORIA-Coria

told HERNANDEZ-Marentes that he was only contacting him to make him aware of the

situation.  HERNANDEZ-Marentes informed CORIA-Coria that he would call him later.  Agents

believe that CORIA-Coria was referring to the quality of drugs that HERNANDEZ-Marentes

provided to CORIA-Coria, as it is common for drug traffickers to use the term "stepped on" to

describe drugs that have too many diluents in them, which traffickers commonly use to

artificially increase the quantity of drugs.

110.    At approximately 3:15 p.m., GS Valdez observed HERNANDEZ-Marentes' dark

blue GMC pick-up park at **HERNANDEZ-Marentes Residence**.

111.    At approximately 6:10 p.m., SA Casiano observed a black sedan park on the street

in front of **IBARRA-Quintero Residence**.  SA Casiano then observed a male driver wearing a

black hooded sweatshirt exit the black sedan and enter **IBARRA-Quintero Residence**.  SA

Casiano conducted drive-by surveillance to obtain the license plate of the black sedan.  SA

Casiano observed the black sedan to bear California license plate 7ADT056.  A check of

California Department of Motor Vehicle records revealed license plate 7ADT056 to be registered

to Evelyn Moran HERNANDEZ at 15654 Cadwell Street, La Puente, CA 91744.

112.    At approximately 6:16 p.m., based on intercepted T-III call session 2327,

IBARRA-Quintero informed HERNANDEZ-Marentes that his buddy wanted to leave now.

HERNANDEZ-Marentes then informed IBARRA-Quintero he was heading over there.

IBARRA-Quintero then told HERNANDEZ-Marentes that he is at the shop.  HERNANDEZ-

Marentes acknowledged.  Cellular location information of **IBARRA-Quintero PHONE 1**

confirmed **IBARRA-Quintero PHONE 1** to be in the vicinity of **IBARRA-Quintero**

**Residence**.

113.    At approximately 6:38 p.m., **IBARRA-Quintero PHONE 1** contacted

**HERNANDEZ-Marentes PHONE 1** via SMS text message.  The ensuing conversation is as

follows, which has been translated from Spanish to English:

114.    Session 2329, at approximately 6:38:05 pm, **IBARRA-Quintero PHONE 1** to

**HERNADNEZ-Marentes PHONE 1**: "Man, these guys need to go because they have to work."

115.    Session 2332, at approximately 6:38:32 pm, **HERNANDEZ-Marentes PHONE**

**1** to **IBARRA-Quintero PHONE 1**: "I'm going over there now."

116.    At approximately 6:36 pm, SA Piatt observed HERNANDEZ-Marentes' dark

blue GMC pick-up exit **HERNANDEZ-Marentes Residence**.

117.    At approximately 6:38 pm, based on intercepted T-III call session 2334,

HERNANDEZ-Marentes informed IBARRA-Quintero that he was going to pick that up.

HERNANDEZ-Marentes added that he only sold one (1).  HERNANDEZ-Marentes asked

IBARRA-Quintero if he remembered.  IBARRA-Quintero affirmed and asked HERNANDEZ-

Marentes to give all he can.  HERNANDEZ-Marentes reiterated that he only sold one (1) and the

other guy was not there, he was at the lake.  IBARRA-Quintero asked HERNANDEZ-Marentes

if two and a half (2 1/2).  HERNANDEZ-Marentes informed IBARRA-Quintero that he gave it

to that guy at twenty-one (21). HERNANDEZ-Marentes instructed IBARRA-Quintero to get the other guys and ask them to bring IBARRA-Quintero some money too. IBARRA-Quintero informed HERNANDEZ-Marentes that he knew and that was what he was doing. IBARRA-Quintero again stated that the buddy needs to go. HERNANDEZ-Marentes told IBARRA-Quintero that he was going to pick this up and then will go over there. IBARRA-Quintero inquired why HERNANDEZ-Marentes has not picked it up yet. HERNANDEZ-Marentes informed IBARRA-Quintero that he was getting on Rio Bravo. HERNANDEZ-Marentes then asked IBARRA-Quintero where he wanted HERNANDEZ-Marentes to meet up with him, so that it is easier. IBARRA-Quintero instructed HERNANDEZ-Marentes to come here now because he is here. IBARRA-Quintero reiterated that he cannot be moving around. HERNANDEZ-Marentes informed IBARRA-Quintero that he was on his way there.

118.    At approximately 6:41 p.m., based on intercepted T-III call session 2338, IBARRA-Quintero told HERNANDEZ-Marentes that he would wait for HERNANDEZ-Marentes. HERNANDEZ-Marentes replied that he would only give him 2 pesos. IBARRA-Quintero confirmed that HERNANDEZ-Marentes said 2-100. HERNANDEZ-Marentes advised IBARRA-Quintero that he was going to get some for gas because he doesn't have any peso. IBARRA-Quintero told HERNANDEZ-Marentes to get for gas from this guy. IBARRA-Quintero then asked HERNANDEZ-Marentes where he wanted to meet. HERNANDEZ-Marentes asked IBARRA-Quintero where he was. IBARRA-Quintero stated that he (the courier) was with IBARRA-Quintero. HERNANDEZ-Marentes then asked IBARRA-Quintero if he had a vehicle. IBARRA-Quintero affirmed and related that he would leave back home after he meets HERNANDEZ-Marentes. HERNANDEZ-Marentes instructed IBARRA-Quintero to

57

tell him that HERNANDEZ-Marentes could meet with him on Coors and I-40, adding at the Walmart. IBARRA-Quintero asked HERNANDEZ-Marentes how long. IBARRA-Quintero then informed HERNANDEZ-Marentes that he would wait for HERNANDEZ-Marentes over there and added that he would call HERNANDEZ-Marentes, and that it would be an 09 number. HERNANDEZ-Marentes confirmed the meet location at the Walmart, to which IBARRA-Quintero affirmed. HERNANDEZ-Marentes asked IBARRA-Quintero how much money he would give. HERNANDEZ-Marentes then told IBARRA-Quintero that he did not make money again. IBARRA-Quintero explained that HERNANDEZ-Marentes would recover on the next one.

119.   At approximately 6:52 p.m., based on intercepted T-III call session 2348, an unidentified male (UM), telephone number 909-419-3153, informed HERNANDEZ-Marentes that he is at the Walmart by Chili's. HERNANDEZ-Marentes informed the UM that he is heading over there right away. UM acknowledged and informed HERNANDEZ-Marentes that he is in front of Chili's in a "black (inaudible word)." HERNANDEZ-Marentes acknowledged and requested that he give HERNANDEZ-Marentes at least five minutes.

120.   At approximately 7:08 p.m., based on intercepted call session 2361, the UM asked HERNANDEZ-Marentes where he was at. HERNANDEZ-Marentes replied that HERNANDEZ-Marentes just spoke with "Chino" (IBARRA-Quintero) about the numbers. UM acknowledged and informs HERNANDEZ-Marentes that he is at Lowe's. HERNANDEZ-Marentes thanked UM and informed him that he will drop by right away. UM acknowledged. Agents believe that "the numbers" was referring to the amount of money that the DTO owes to the courier for the drugs.

At approximately 7:34 p.m., based on intercepted T-III call session 2379, HERNANDEZ-Marentes asked where UM is at. UM informed HERNANDEZ-Marentes that he is here. UM then asked HERNANDEZ-Marentes what car HERNANDEZ-Marentes had. HERNANDEZ-Marentes told UM that he has a black truck. HERNANDEZ-Marentes then added that he was next to the Walgreen's. UM asked HERNANDEZ-Marentes if he has a big black truck. HERNANDEZ-Marentes affirmed. UM asked HERNANDEZ-Marentes if it is a GMC. HERNANDEZ-Marentes stated that he could see UM now. UM acknowledged. Agents believe that HERNANDEZ-Marentes provided money owed to the courier for the drugs, and the courier then returned to California. Agents received two license plate reader notifications for California license plate 7ADT056 heading westbound on I-40.

### K. *August 15, 2019 Trash Pull Indicating CORIA-Coria Residence 1 is Used to Traffic Illegal Drugs*

121.   On August 15, 2019, Albuquerque District Office (ADO) Group 1 SA Jewellia Casiano and SA Thomas Robertson conducted a trash pull at **CORIA-Coria Residence 1**. At approximately 8:39 a.m., SA Robertson and SA Casiano were able to obtain the discarded trash from a garbage container which was located on the curbside of the street directly in front of **CORIA-Coria Residence 1**. Agents also observed a gray sedan bearing New Mexico license plate PCD604 parked in the driveway of **CORIA-Coria Residence** 1. A subsequent check of the New Mexico Department of Motor Vehicle records of New Mexico license plate PCD604 revealed the license plate to be registered to Mario MENDOZA at 1907 Isleta Boulevard SW, Albuquerque, NM 87121. This vehicle was utilized by HERNANDEZ-Marentes during a UC purchase for approximately one pound of methamphetamine from HERNANDEZ-Marentes on May 23, 2019.

122.    At approximately 8:46 am, SA Casiano and Robertson were able to examine the

discarded trash to determine if there was anything of evidentiary value contained there

within.  Discovered within the discarded trash from **CORIA-Coria Residence 1** were several

shredded wrappings with a "M24" label containing a white, crystalline substance.  Based on my

training and experience, this packaging is commonly used to wrap drugs for transportation, as it

makes it easier to handle and easier to transport in concealed compartments within vehicles.  It is

also common for Sources of Supply to place markings on the wrappings to identify their drugs.

Agents conducted a field test which yielded a presumptive positive for the presence of

methamphetamine.

### L.   *August 20, 2019 Trash Pull Indicating IBARRA-Quintero Residence Is Used to Traffic Illegal Drugs*

123.    On August 20, 2019, agents of the Albuquerque District Office (ADO) - Group 1

performed a trash pull at **IBARRA-Quintero Residence**.

124.    At approximately 11:48 AM, SA Tim Piatt collected the discarded trash from the

residence, as witnessed by GS Gabriel Valdez and SA Andrew Sneden. GS Valdez, SA Sneden

and SA Piatt then examined the discarded waste for any items of evidentiary value. Located in

the trash was a bundle of orange in color, plastic shrink wrapping with a piece of gray duct tape

adhered to one end. The duct tape was labeled in black permanent marker,"171.3 and 172.6".

Based on my training and experience, this packaging is commonly used to wrap drugs for

transportation, as it makes it easier to handle and easier to transport in concealed compartments

within vehicles.  Similarly, I believe that the numbering written on the packaging is the weight,

in grams of each package of drugs, which is the equivalent of approximately 6 ounce quantities.

Agents also obtained a piece of mail that was an advertisement for Route 66 Casino in

Albuquerque addressed to Cristhian IBARRA-Quintero at 2513 Mervosh Ave SW, Albuquerque, NM 87105.

### M. September 8, 2019 T-III Intercepts and Surveillance Indicating CORIA-Coria Residence 1 and HERNANDEZ-Marentes Residence Are Used to Traffic Illegal Drugs

125.    On September 8, 2019, Agents intercepted multiple electronic and wire communications from **HERNANDEZ-Marentes PHONE 1** that were indicative of illegal narcotics trafficking.

126.    At approximately 11:16 am, SA Casiano observed HERNANDEZ-Marentes' dark blue GMC pick-up to be parked at **HERNANDEZ-Marentes Residence**.

127.    At approximately 12:17 pm, based on intercepted T-III call session 193, between HERNANDEZ-Marentes and AGUILAR, AGUILAR told HERNANDEZ-Marentes that he needed HERNANDEZ-Marentes to go to his buddy.  HERNANDEZ-Marentes asked what he should tell him.  AGUILAR replied that they were going to try out, the one with the nine (9). AGUILAR reiterated to HERNANDEZ-Marentes that it will mark nine (9) on the dashboard. HERNANDEZ-Marentes acknowledged and informed AGUILAR that he would call him back. Agents believe that AGUILAR was referring to the weight of the drugs he wanted HERNANDEZ-Marentes to provide to him, and that he wanted HERNANDEZ-Marentes to contact his alternate SOS to pick up the drugs.

128.    At approximately 12:18, HERNANDEZ-Marentes PHONE 1 sent an SMS text message to an unidentified male stating: "I already have the 90 bucks".  Agents believe that HERNANDEZ-Marentes was informing his alternate source that he was getting the money together for the drugs and wanted to make sure that the SOS had them ready for HERNANDEZ-Marentes.

129.     At approximately 12:35 p.m., SA Casiano observed HERNANDEZ-Marentes'

dark blue GMC pick-up depart from **HERNANEZ-Marentes Residence**.

130.     At approximately 12:36 pm, based on intercepted T-III call session 202,

HERNANDEZ-Marentes contacted **CORIA-Coria PHONE 3**.  HERNANDEZ-Marentes asked

where CORIA-Coria was at and that he (HERNANDEZ-Marentes) wanted to drop sixty (60)

bucks to these guys so they can get HERNANDEZ-Marentes the things.  HERNANDEZ-

Marentes added that they have "things" for him but he did not want to go over empty handed.

HERNANDEZ-Marentes then informed CORIA-Coria that he would go to **CORIA-Coria**

**Residence 1**[10] then return to his house, that he was out running errands and will be arriving in

five minutes.  CORIA-Coria acknowledged.  Agents believe that HERNANDEZ-Marentes was

calling CORIA-Coria to inform him that he needed money for the purchase of drugs.

131.     At approximately 12:50 p.m., SA Sneden observed HERNADEZ-Marentes' dark

blue GMC pick-up turn southbound on Southfield Drive SW from Gun Club Road SW.  Agents

did not follow HERNANDEZ-Marentes down Southfield Drive SW because surveillance units

could easily be detected by HERNANDEZ-Marentes.  **CORIA-Coria Residence 1** is located

---

[10] **CORIA-Coria Residence 1** is one of Jose Mario CORIA-Coria residences. Agents also
believe the HERNANDEZ-Marentes DTO is utilizing CORIA-Coria Residence 1 as a stash
house.  Surveillance and wire intercepts have corroborated this.  I believe CORIA-Coria stored
and will continue to store drugs, drug proceeds, and evidence of drug distribution at **CORIA-
Coria Residence 1**. Throughout this investigation, and as explained in more detail below, agents
are aware of members of the HERNANDEZ-Marentes DTO visiting **CORIA-Coria Residence
1** on multiple occasions and engaging in what agents believe to be illegal narcotics transactions.
Agents have observed vehicles used by the HERNANDEZ-Marentes DTO parked at **CORIA-
Coria Residence 1**. Agents have intercepted phone and wire communications indicating that
CORIA-Coria stores drugs and evidence of drug trafficking at **CORIA-Coria Residence 1**.
Therefore, I believe that evidence of drug trafficking is present and will be found **in CORIA-
Coria Residence 1**.

just west of Southfield Drive SW and Alpine Road SW.

132.    At approximately 12:52 p.m., based on intercepted T-III call session 209, HERNANDEZ-Marentes contacted CORIA-Coria and informed him that he was outside. CORIA-Coria acknowledged.  At approximately 1:02 pm, cellular location information of **HERNANDEZ-Marentes PHONE 1** confirmed **HERNANDEZ-Marentes PHONE 1** to be in the vicinity of **CORIA-Coria Residence 1**.

133.    At approximately 1:13 p.m., based on intercepted T-III call session 227, HERNANDEZ-Marentes informed AGUILAR that the SOS was not in the Albuquerque area because he is working and that he would be back in four (4) hours at the latest.  AGUILAR stated that he would have to see if they want to wait.  HERNANDEZ-Marentes informed AGUILAR that if they want to wait, it will be for sure because the SOS assured him that he will get it done.  AGUILAR agreed to wait until 5:00 pm for the SOS.  AGUILAR told HERNANDEZ-Marentes to tell the SOS to hurry up because he (AGUILAR) does not want to lose the clients.  HERNANDEZ-Marentes again informed AGUILAR that if the SOS says it will happen, then it will happen.

134.    At approximately 1:33 p.m., SA Casiano observed HERNANDEZ-Marentes' dark blue GMC pick-up park at **HERNANDEZ-Marentes Residence**. Agents believed that HERNANDEZ-Marentes was waiting to complete the drug transaction at that time. But based on later T-III intercepts and surveillance, agents believe that the deal never took place, in part, because members of the HERNANDEZ-Marentes DTO identified surveillance units.

### N.   *September 8, 2019 Surveillance Confirming IBARRA-Quintero Remains Active at IBARRA-Quintero Residence*





135.   The above still photographs were captured on September 8, 2019, by a camera mounted at **IBARRA-Quintero Residence** and show the area on the west side of **IBARRA-Quintero Residence**. In the photographs above, a person agents believe to be IBARRA-Quintero

64

appears with a gray Nissan Sedan. IBARRA-Quintero appears to retrieve a bag from the vehicle

and bring it into IBARRA-Quintero Residence. Based on IBARRA-Quintero's participation in

the DTO, and agent training and experience, agents believe IBARRA-Quintero may be bringing

proceeds or drugs into **IBARRA-Quintero Residence**.

      136.    At approximately 12:38 pm, SA Robertson observed a gray Nissan sedan bearing

New Mexico license plate 300TTY to be parked in front of **IBARRA-Quintero Residence**.

Agents have previously observed IBARRA-Quintero operating this vehicle during surveillance

operations.

### O. September 12, 2019 Surveillance of IBARRA-Quintero and DIBENE-SAAVEDRA Loading Luggage into a Nissan Sentra at IBARRA-Quintero Residence

      137.    On September 12, 2019, at approximately 12:37 p.m., agents received information

from pole camera monitors that IBARRA-Quintero and Rodolfo DIBENE-SAAVEDRA were

loading luggage into a gray 2016 Nissan Sentra just outside of IBARRA-Quintero Residence,

including a hand held cooler. After loading the vehicle, IBARRA-Quintero and DIBENE-

Saavedra entered the vehicle and drove away from the IBARRA-Residence. At approximately

12:53 p.m., GS Valdez observed the vehicle pulling into the Enterprise car rental parking lot near

the Sunport in Albuquerque, NM. GS Valdez saw IBARRA-Quintero and DIBENE-Saavedra

park the vehicle, exit, and enter the rental office. Shortly afterward, agents placed IBARRA-

Quintero and DIBENE-Saavedra in custody, based on agent's belief that they were engaged in

activities in furtherance of the drug conspiracy. The Nissan Sentra was seized and transported to

the ADO; it has yet to be searched. Based on previous intercepted communications, confidential

source information, and the investigation as a whole, agents believe this activity is consistent

with loading drugs or drug proceeds for delivery, and procuring a rental car to conduct transport

of illegal drugs or drug proceeds.

## XII.   CONCLUSION

138.    Based on my training and experience, I believe that the Subject Premises are being used to distribute controlled substances and further that the Subject Premises are being used to store quantities of illegal drugs, and that these quantities are broken down into smaller quantities and provided to other distributors. I also believe that the Subject Devices have been used to distribute controlled substances.

139.    I further assert there is probable cause to believe that at the Subject Premises and in the Subject Devices will be found evidence, instrumentalities, and the fruits of violations of 21 U.S.C. §§ 841(a)(1) and 846, distributing and possessing with intent to distribute a controlled substance and conspiracy to commit these offenses, as well as 18 U.S.C. § 1956, Laundering of Monetary Instruments, as described in Attachment B. I further believe that the items listed on Attachment B, and incorporated into this Affidavit by reference, may be found at the premises and on the devices to be searched. I base this belief on the information set forth above, my training and experience, and the experience of the law enforcement officers with whom I has consulted.

140.    Furthermore, in a number of residential and electronic device searches in prior investigations that my office has been involved in, these enumerated types of evidence have typically been recovered from the devices, the main residence and in addition, from other structures and areas on the property being searched, as for example, other storage lockers/areas, detached closets, containers, and yard areas associated with the main residence and used in connection with or within the curtilage of said residential property.

141.    Finally, I have presented this affidavit to Kristopher N. Houghton, Assistant

United States Attorney, and he has advised me that, in his opinion, the proposed warrant is in

proper form and is supported by probable cause.

142.    I swear that this information is true and correct to the best of my knowledge and

belief.

THOMAS J. ROBERTSON
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me
This 12th day of September, 2019.

THE HONORABLE LAURA FASHING
UNITED STATES MAGISTRATE JUDGE

67